# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  November 12, 2015**

**NO. S-1-SC-34637**

**STATE OF NEW MEXICO,**

Plaintiff-Respondent,

**v.**

**MARK SERROS,**

Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Robert M. Schwartz, District Judge**

Jorge A. Alvarado, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Hector H. Balderas, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Respondent

**OPINION**

**BOSSON, Justice.**

{1}    Four years and three months after Defendant Mark Serros was arrested and charged with sexually abusing his nephew, the district court dismissed his case, concluding that his right to a speedy trial under the Sixth Amendment to the United States Constitution had been violated. Among other things, the district court found that Defendant had suffered extreme prejudice as a result of the length and circumstances of his detention. From the time of his arrest over four years earlier, Defendant had been held at the Bernalillo County Metropolitan Detention Center (MDC) in protective custody, a form of administrative segregation in which he was confined alone in a jail cell for over 23 hours a day.

{2}    In a divided memorandum opinion, the Court of Appeals reversed. *See State v. Serros*, No. 31,565, mem. op. ¶¶ 1, 58 (N.M. Ct. App. Mar. 10, 2014) (non-precedential). The majority reasoned that the delay in bringing Defendant to trial could not be attributed to the State. *See id.* ¶ 52. The majority faulted Defendant because he had agreed to numerous requests to extend the time for commencing trial and had twice requested new counsel. *See id.* By contrast, the dissent concluded that the delays resulted primarily from the "negligence and disregard" of Defendant's attorneys and that, whether or not the State was at fault, Defendant's right to a speedy

trial had been violated. *See id.* ¶ 60 (Zamora, J., dissenting).

{3} We granted certiorari and now reverse. 2014-NMCERT-005. We agree with the district court's conclusion that the length and circumstances of Defendant's pre-trial incarceration resulted in extreme prejudice. We therefore hold that dismissal was appropriate because Defendant did not cause or acquiesce in the numerous delays in his case and because the State failed in its obligation to bring Defendant's case to trial.

## I. BACKGROUND

### A. The right to a speedy trial

{4} The Sixth Amendment to the United States Constitution begins, "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." *See* N.M. Const. art. II, § 14. In *State v. Garza*, we emphasized that "[t]he heart of the right to a speedy trial is preventing prejudice to the accused." 2009-NMSC-038, ¶ 12, 146 N.M. 499, 212 P.3d 387. But we also recognized that the right is unique among the constitutional guarantees afforded a criminal defendant because of the concomitant "societal interest in bringing an accused to trial." *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 519 (1972)). As a result, merely showing delay in bringing an accused's case to trial is not enough to establish a speedy trial violation; rather, we must

scrutinize every claimed violation to determine whether the accused has suffered an "actual and articulable deprivation" of the right to a speedy trial. *See id.* ¶¶ 12-13.

{5} In making that determination, we consider the four factors articulated in *Barker*: (1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay. *See* 407 U.S. at 530; *see also Garza*, 2009-NMSC-038, ¶ 13 ("[W]e have adopted the balancing test created by the United States Supreme Court in *Barker*."). We weigh these factors according to the unique circumstances of each case in light of "the State and the defendant's conduct and the harm to the defendant from the delay." *See Garza*, 2009-NMSC-038, ¶¶ 12-13. We therefore begin with a review of the circumstances in this case.

**B.      Factual and procedural time line**

{6} Defendant was arrested on March 9, 2007, and detained at the MDC on suspicion of sexually abusing his four-year-old nephew. Due to the charges against him and because he is homosexual, MDC officials placed him almost immediately in protective custody for his safety. On March 26, 2007, a grand jury indicted Defendant on one count each of first-degree criminal sexual penetration (a child under 13), *see* NMSA 1978, § 30-9-11(C) (2003); bribery of a witness (threats or

bribes—reporting), *see* NMSA 1978, § 30-24-3(A)(3) (1997); and contributing to the delinquency of a minor, *see* NMSA 1978, § 30-6-3 (1990). Defendant pleaded not guilty to all three counts, and the district court set his bond at $150,000 cash or surety. Unable to afford his bond, Defendant remained in protective custody at the MDC awaiting trial.

{7} Defendant never had a trial. Instead, more than four years after his arrest, the district court dismissed Defendant's case with prejudice, following three days of hearings on Defendant's motion to dismiss on speedy trial grounds due to ineffective assistance of counsel. The evidence introduced at the hearings, which we review in some detail throughout this opinion, included testimony from four defense witnesses, including Defendant himself; court-ordered appearances by Defendant's first two court-appointed attorneys, Houston Ross and Scott Pistone; subpoenas for Mr. Ross's and Mr. Pistone's attorney case files and Disciplinary Board records; and extensive argument by the parties.

{8} The record shows the following time line of significant events in Defendant's case. On May 10, 2007, Mr. Ross filed a single document on Defendant's behalf that included his entry of appearance, a request for grand jury tapes, and demands for a speedy trial, discovery, and exculpatory evidence. On September 11, 2007, the district

4

court set Defendant's case for trial on September 24, 2007. Three days later, on September 14, 2007, the State filed its first petition for an extension of time to commence Defendant's trial, noting that the State's investigation was ongoing and that Defendant had not requested or conducted any pretrial interviews. Mr. Ross later stipulated to the petition on Defendant's behalf and requested a plea offer. The district court granted the petition and extended the deadline for commencing Defendant's trial to January 2, 2008. The district court also set a plea hearing for October 23, 2007.

{9} On November 21, 2007, the district court set a pretrial hearing for December 14, 2007. On December 12, 2007, however, the State filed its second petition to extend the time for commencing Defendant's trial, again with Mr. Ross's agreement. In its second petition, the State represented that it was in the process of "formulating an offer" in response to Defendant's request for a plea agreement, that the case was not ready for trial, that Defendant had not requested or conducted any pretrial interviews, and that the parties were "hopeful that if given more time, the case will result in a non-trial disposition." The district court granted the petition, extended the deadline for commencing Defendant's trial to April 2, 2008, and set the trial for March 24, 2008. In the interim, the district court set a second plea hearing for January

25, 2008.

{10} On February 22, 2008, the district court continued the March 24, 2008 trial setting. The court noted in its continuance order that Mr. Ross had requested an "evaluation" and that "[a]dditional/new evidence [had been] disclosed recently." That order was followed on March 20, 2008, by the State's third petition to extend the deadline for commencing Defendant's trial, filed in this Court as was then required by Rule 5-604(D) NMRA, and again stipulated to by Mr. Ross. As grounds for the petition, the State represented that although it had completed its initial investigation, it had been necessary to conduct a second safehouse interview of the victim on February 20, 2008, because of a report that the victim had recanted the allegations against Defendant or possibly had named a different abuser. The State further represented that the victim had not, in fact, recanted his story at the second interview and that a supplemental report had been prepared by a detective and distributed to the parties. The State also noted that Mr. Ross was "still evaluating the case in an effort to determine whether an evaluation of his client is in order" and that Defendant had not requested or conducted any pretrial interviews. The State concluded by stating that Defendant's case had been "set for a definite trial setting on August 11, 2008, which is outside the current . . . date [permitted by Rule 5-604]," and requested an

extension through October 2, 2008. This Court granted the petition on April 1, 2008, and extended the deadline for commencing Defendant's trial to September 2, 2008.

{11} In the ensuing months, the district court set pretrial conferences for May 29, 2008, and July 31, 2008, and set the case for a jury trial on August 25, 2008. But on August 18, 2008, the State—once again noting Mr. Ross's agreement on Defendant's behalf—filed its fourth petition to extend the time to commence Defendant's trial. The State represented to this Court that it had made a plea offer to Mr. Ross that had not yet been accepted, that Mr. Ross had refused the State's request "that a sex offender [evaluation] be completed," and that Mr. Ross had not requested or conducted any pretrial interviews. The State also represented that, because it had not heard from Mr. Ross about the plea offer and because the parties would not be ready for trial on August 25, 2008, the district court had re-set the matter at the parties' request for trial on December 8, 2008, which the State noted was after the previous deadline set by this Court. The State therefore requested, and this Court granted on August 25, 2008, an order extending the time to commence Defendant's trial to March 2, 2009. On September 2, 2008, the district court set a plea hearing for October 14, 2008, and on October 14, 2008, the district court set Defendant's case for a jury trial on December 1, 2008.

{12} Here, the case took an unexpected turn. On October 23, 2008, after over 17 months of Mr. Ross's representation, Defendant filed a pro se motion to appoint substitute counsel. The motion was simple, alleging only that Defendant had been in custody since March 9, 2007, and that he believed that Mr. Ross was "not able to adequately represent [his] interests" in the case.

{13} In the weeks that followed, the State filed several documents suggesting that the parties were preparing for trial. Most notably, the State submitted two stipulated orders that the district court granted. The first, entered on November 3, 2008, provided for the production to Defendant of the victim's safehouse interviews and for the protection of the victim's privacy. The second, entered on November 7, 2008, ordered production to the State of treatment and medical records from the Bernalillo County Fire Department related to its response to the victim's home on March 2, 2007.

{14} Instead of proceeding with Defendant's trial, which had been set to begin on December 1, 2008, the district court granted Defendant's pro se motion to appoint substitute counsel that same day and removed Mr. Ross from the case. In its order, the district court found that "while there is no indication that [Mr. Ross] has not fully and effectively represented . . . [D]efendant, it is in the interest of justice to appoint new

8

counsel in view of [D]efendant's . . . unwillingness to work with [Mr. Ross]." The court therefore ordered that the case be returned to the Public Defender for reassignment and specifically ordered that "any delay caused by the change of counsel be charged against the defendant for speedy trial purposes." Also on December 1, 2008, the district court rescheduled Defendant's trial for February 9, 2009.

{15}    On January 23, 2009, Defendant's second attorney, Scott Pistone, entered his appearance and filed a notice of demand for discovery and a demand for a speedy trial. On February 13, 2009, the district court issued a notice setting Defendant's case for trial on July 20, 2009, and on February 16, 2009, the State filed its fifth petition to request an extension of time to commence Defendant's trial. The State represented that it had been contacted by Mr. Pistone on January 28, 2009, that he had indicated that he would not be ready for trial on February 9, 2009, and that he would "stipulate to whatever was needed to continue the trial setting." The State further explained that on February 3, 2009, the State had learned that Mr. Pistone was out of the state tending to his ill father and that a few days later, Mr. Pistone's father had passed away. The State said that it had notified the district court of Mr. Pistone's unavailability, the court had agreed to continue the trial set for February 9, 2009, and

it had set a new trial date of July 20, 2009, which was after the deadline for commencing Defendant's trial under Rule 5-604. The State then requested an extension of the time to commence Defendant's trial until September 2, 2009, which this Court granted on February 24, 2009.

{16}    The next entry in the district court record, entered on July 10, 2009, is an order staying the case pending a determination of Defendant's competency to stand trial. The order states only that the court had "considered information from both counsel and [found] that there is evidence that . . . [D]efendant may not be competent to proceed in this case." The court therefore stayed the case and all deadlines under Rule 5-604 "until an order is filed finding . . . [D]efendant competent to stand trial or until further order of the court."

{17}    The record does not show any further activity in Defendant's case until approximately six months later, when Mr. Pistone filed an unopposed motion to withdraw as Defendant's counsel. Mr. Pistone alleged that Defendant had filed a disciplinary complaint against him, that Defendant was filing his own motions, that Defendant was not complying with Mr. Pistone, and that the attorney-client relationship had deteriorated. The district court held a hearing on the motion to withdraw on March 24, 2010, and granted Mr. Pistone's request. The court did not

issue an order with formal findings and conclusions, but in the transcript of the hearing—at which Defendant was present but did not testify—the district court admonished Defendant that "the next attorney you get, you're stuck with. I'm not going to play this game with you, so that's the way it's going to be. Your next attorney, whether you like him or her, ain't gonna matter."

{18} On May 19, 2010, Liane Kerr entered her appearance on Defendant's behalf and demanded a speedy trial. That same day, Ms. Kerr filed Defendant's first witness disclosure in the case; a notice of discovery demand; and a notice of non-availability for several dates in October, November and December of 2010. The case remained quiescent until October 18, 2010, when the district court entered an order submitted by Ms. Kerr that lifted the stay in Defendant's case. The order explained that a competency evaluation had been completed and that Ms. Kerr was satisfied "that there [were] no competency issues." Also on October 18, 2010, more than three-and-a-half years after Defendant's arrest, Ms. Kerr filed a motion to dismiss the case against Defendant "on speedy trial grounds due to ineffective assistance of counsel."

{19} Unfortunately, the filing of Defendant's motion to dismiss did not end the delays in his case. The district court originally set the motion for a hearing on November 17, 2010, one of the dates that Ms. Kerr had indicated she would not be

11

available. The court then reset the hearing for December 16, 2010, and later vacated that setting after Ms. Kerr filed an unopposed motion to continue the hearing because she had learned that she would be recovering from a medical procedure through the end of 2010. On November 29, 2010, the district court set Defendant's case for a jury trial on February 28, 2011, noting that "THERE WILL BE NO MORE CONTINUANCES." But on February 22, 2011, the court retreated from that position and set a hearing on Defendant's motion to dismiss for March 23, 2011, five months after Ms. Kerr had filed the motion to dismiss. That hearing took place and it was followed by two other hearings over the next two months—one on April 15, 2011, and one on May 24, 2011—and finally, on June 23, 2011, the district court granted Defendant's motion, dismissed the case against him with prejudice, and ordered his release.

## II.    DISCUSSION

{20}    In its dismissal order, the district court weighed the *Barker* factors and concluded that Defendant's right to a speedy trial had been violated. In reviewing a district court's ruling on a speedy trial violation claim, we defer to the court's findings of fact, and we weigh and balance the *Barker* factors de novo. *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272.

{21} Before we begin our analysis, we note that the circumstances of this case are extreme. As we will explain in further detail, the parties agree that Defendant was held without a trial for over four years and three months in conditions that amounted to solitary confinement. These circumstances necessarily color our entire analysis.

## A. Length of delay

{22} The first factor, the length of delay, has a dual function: it acts as a triggering mechanism for considering the four *Barker* factors if the delay crosses the threshold of being "presumptively prejudicial," and it is an independent factor to consider in evaluating whether a speedy trial violation has occurred. *See Garza*, 2009-NMSC-038, ¶¶ 21, 23. We have established benchmarks for presumptively prejudicial delay according to the complexity of a case: one year for a simple case, 15 months for a case of intermediate complexity, and 18 months for a complex case. *See id.* ¶ 48.

{23} The district court found a delay in Defendant's case of almost four and one half years. The court, however, made no findings about the level of complexity of Defendant's case or about whether the length of delay weighed for or against either party. The State concedes that the length of delay may have become presumptively prejudicial irrespective of the case's complexity. Given the extreme length of delay, we find it unnecessary to determine whether the case should have been tried within

13

15 or 18 months; from Defendant's perspective, it makes little difference whether he was entitled to a trial a full three years before his release or a "mere" two years and nine months before his release. Either way, he remained in jail without a trial far longer than was presumptively allowed. We therefore hold that the district court correctly considered the four *Barker* factors. *See Garza*, 2009-NMSC-038, ¶ 23 ("If a court determines that the length of delay is 'presumptively prejudicial,' then it should consider the length of delay as one of four factors in the analysis . . . .").

{24}     In evaluating the first *Barker* factor, we previously have held that "the greater the delay[,] the more heavily it will potentially weigh against the State." *Garza*, 2009-NMSC-038, ¶ 24. The district court did not explicitly weigh the length of delay for or against either party. But given the extreme length of the delay in this case, we do not consider this to be a difficult question. The delay of over 51 months was extraordinary, and therefore it weighs heavily in Defendant's favor. *See, e.g.*, *State v. Fierro*, 2012-NMCA-054, ¶ 36, 278 P.3d 541 (holding that a period of almost 55 months between the defendant's arrest and trial weighed heavily in his favor); *cf. Garza*, 2009-NMSC-038, ¶ 24 (holding that a delay of one month and six days beyond the guideline for presumptive prejudice "was not extraordinary and [did] not weigh heavily in Defendant's favor").

14

{25} We pause before turning to the other *Barker* factors to address the Court of Appeals majority's analysis on this point. As we explain more fully below, the district court found that the State was not at fault for the delay in bringing Defendant's case to trial, and it found that all of the delay was attributable to Defendant's attorneys. Relying on these findings, the Court of Appeals majority concluded that the length of delay "cannot . . . weigh[] even slightly against the State. At the very least, we weigh this factor slightly against Defendant." *Serros*, No. 31,565, mem. op. ¶ 17. The State agrees and argues that *Garza* stands for the proposition that "[w]here the State is not at fault, it is inappropriate to weigh even lengthy delays against it."

{26} We disagree and clarify that the parties' fault in causing the delay is irrelevant to the analysis of the first *Barker* factor. *See State v. Stock*, 2006-NMCA-140, ¶ 16, 140 N.M. 676, 147 P.3d 885 ("While . . . it would seem to make sense to consider the reason for delay in deciding what weight to assign to the length of delay[,] . . . our cases have not seemed to proceed in that matter."); c*f. State v. Urban*, 2004-NMSC-007, ¶ 13, 135 N.M. 279, 87 P.3d 1061 ("Although not all of the delay can be attributed to the State, we do not consider the extent to which the delay can be attributed to the State or Defendant when first determining whether the delay is presumptively prejudicial."). The length of delay is an objective determination that

15

is capable of measurement with some precision, and once established, it colors the rest of the speedy trial analysis. A delay that crosses the threshold for presumptive prejudice necessarily weighs in favor of the accused; the only question is, how heavily? *See Stock*, 2006-NMCA-140, ¶ 17 ("[E]ven where a defendant bears some responsibility for delay, the sheer fact of lengthy incarceration or other restraint on liberty should count for something in the speedy trial analysis."). A delay that "scarcely crosses the 'bare minimum needed to trigger judicial examination of the claim'" is of little help to a defendant claiming a speedy trial violation. *Garza*, 2009-NMSC-038, ¶ 24 (quoting *Doggett v. United States*, 505 U.S. 647, 652 (1992)). Conversely, an extraordinary delay, like the delay in this case, weighs heavily in favor of a defendant's speedy trial claim, bearing in mind that no single factor is dispositive of whether a violation has occurred. *See id.* ¶¶ 23-24.

{27}  We acknowledge that our framing of this factor as potentially weighing "*against* the State" may have invited some consideration of fault. *Id.* ¶ 24 (emphasis added). Indeed, the Court of Appeals majority apparently was reluctant to weigh this factor "*against* the State" because the district court had specifically found that the State was not at fault for the delay. *Serros*, No. 31,565, mem. op. ¶ 17 (emphasis added). But as the majority's holding illustrates, faulting the parties at this stage of

16

the analysis can lead to an incongruous result, especially in a case such as this one, when the objective length of delay offers perhaps the clearest evidence that a violation may have occurred. To weigh a delay of over four years against *Defendant*—even slightly—is simply unjust, keeping in mind that the right at stake is Defendant's right to a speedy trial. The remaining *Barker* factors leave ample room to consider whether the other circumstances in the case, including the fault of the parties, outweigh the length of the delay.

{28}     In sum, we conclude that the length of delay in this case was presumptively prejudicial and weighs heavily in favor of Defendant's claim that his speedy trial rights were violated. We therefore look to the other *Barker* factors to determine whether they tip the balance back in favor of the "societal interest in bringing [Defendant] to trial." *Garza*, 2009-NMSC-038, ¶ 12.

**B.     Reason for the delay**

{29}     The second factor in the *Barker* analysis, the reason for the delay, requires a court to evaluate "'the reason the government assigns to justify the delay.'" *Garza*, 2009-NMSC-038, ¶ 25 (quoting *Barker*, 407 U.S. at 531). "'The reasons for a period of the delay may either heighten or temper the prejudice to the defendant caused by the length of the delay.'" *Id.* (quoting *State v. Maddox*, 2008-NMSC-062, ¶ 13, 145

17

N.M. 242, 195 P.3d 1254). We previously have recognized three types of delay that may be attributed to the State and weighted against it at varying levels. First, "'[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.'" *Id.* (quoting *Barker*, 407 U.S. at 531 (alteration in original)). Second, "negligent or administrative delay . . . 'should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" *Id.* ¶ 26 (quoting *Barker*, 407 U.S. at 531). As the length of delay increases, negligent or administrative delay weighs more heavily against the State. *See id.* And third, "appropriate delay," justified for "a valid reason, such as a missing witness," is neutral and does not weigh against the State. *Id.* ¶ 27 (quoting *Barker*, 407 U.S. at 531). The U.S. Supreme Court also has recognized a fourth type of delay that this Court has not yet considered, delay "caused by the defense," which weighs against the defendant. *See Vermont v. Brillon*, 556 U.S. 81, 90, 94 (2009) (holding that the defendant's "deliberate attempt to disrupt proceedings" weighed heavily against the defendant).

**{30}**     Since filing his motion to dismiss, Defendant consistently has blamed the delay in this case not on the State, but on Mr. Ross and Mr. Pistone, the first two attorneys

18

appointed to represent him. Indeed, Defendant's motion to dismiss purportedly relied on ineffective assistance of counsel as the basis for the violation of Defendant's right to a speedy trial. But Ms. Kerr later clarified at the hearing on the motion to dismiss that her use of that term was imprecise; she instead argued that Defendant's speedy trial rights were violated due to attorney neglect, as recognized by the Court of Appeals in *Stock*. *See* 2006-NMCA-140, ¶¶ 21-22 (holding that the defendant's right to a speedy trial was violated when, among other things, delays caused by the "neglect" of his attorneys could not be held against him for speedy trial purposes because they were "unreasonable and unnecessary" and "solely attributable to [defense] counsel"). Similarly, the district court referred to ineffective assistance of counsel in its dismissal order, but it expressly based its dismissal on *Stock* and did not engage in an ineffective-assistance-of-counsel analysis. *See, e.g.*, *State v. Astorga*, 2015-NMSC-007, ¶17, 343 P.3d 1245 ("'To establish ineffective assistance of counsel, a defendant must show: (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" (quoting *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799)). We therefore analyze the performances of Mr. Ross and Mr. Pistone in this case under *Stock* and do not reach the adequacy of their representation under the Sixth Amendment right to effective

19

assistance of counsel. *Cf. State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317 ("In interpreting statutory language as well as in much of the other work courts are called on to perform, it is necessary to think thoughts and not words.").

{31} The district court agreed with Defendant that the delay was attributable to Mr. Ross and Mr. Pistone and that the State did not cause the delay. The court concluded in its dismissal order (1) that the State had not intentionally caused any of the delay in Defendant's case or sought to interfere with Defendant's right to a speedy trial, (2) that the State "reasonably acquiesced to requested changes in defense counsel and defense continuances," and (3) that Mr. Ross and Mr. Pistone were "responsible for the delay in this case." Regarding Mr. Ross, the district court found that although he was not ineffective under *Stock*, he had delayed Defendant's trial by "schedul[ing] plea hearings when the defendant did not request them." As for Mr. Pistone, however, the court found that he was ineffective and that he had delayed the case by raising the issue of Defendant's competency just before a trial setting in July 2009 without actually seeking or obtaining a competency evaluation, and by seeking to withdraw from the case because of a disciplinary complaint against him that actually was never filed. As with the length of delay, the district court did not explicitly weigh the reasons for the delay against either party when it dismissed Defendant's case.

{32} The Court of Appeals majority agreed with the district court that the State had not intentionally caused the delay in this case. *See Serros*, No. 31,565, mem. op. ¶ 19. The Court therefore concluded that "the reasons for the delay . . . do not weigh against the State," and it "turn[ed] to examine whether the delay was attributable to Defendant or his counsel." *Id.* The Court of Appeals then considered the three periods during which Defendant was represented by Mr. Ross, Mr. Pistone, and Ms. Kerr, respectively, and concluded that all but three months of the delay in the case weighed heavily against Defendant. *See id.* ¶¶ 12, 19--38. The Court primarily faulted Defendant for either not objecting to or stipulating to the "numerous continuances and extensions" in the case and for seeking to replace Messrs. Ross and Pistone at "crucial time[s]" in the case. *Id.* ¶¶ 22, 33, 36.

{33} Defendant continues to argue in this appeal that the reasons-for-delay factor should not weigh against him because the delays were caused by his attorneys' neglect. Although Defendant agrees with the district court and the Court of Appeals that the State did not act "in any way to cause the delay," he contends that there is a difference between "the State's lack of affirmative action to delay the trial and the State's knowledge that [Defendant's] attorneys were doing nothing to move the case forward." Because of the latter contention, Defendant argues that the State was "at

least partly responsible [for the delay] due to its inaction." Defendant therefore contends that, as in *Stock*, this factor should weigh against the State because it failed in its "obligation to move [the case] forward and to see that justice is done."

{34} We have never considered the contours of the Court of Appeals' holding in *Stock* or how it might apply in a case like the one before us, in which Defendant was subjected to extraordinary delay while being held in custodial segregation. We therefore review the analysis and holding of *Stock* before we consider whether it applies in this case.

**1.** ***We adopt the reasoning of* State v. Stock *in speedy trial cases when the delay is extraordinary and the accused is held in custody***

{35} In *Stock*, our Court of Appeals held that the defendant's speedy trial rights had been violated after a "particularly egregious" delay of three and-a-half years, during which time the defendant had been incarcerated and "harassed and assaulted in jail." *See* 2006-NMCA-140, ¶¶ 18, 36. Analyzing the reasons for the delay, the Court focused on a period of nearly two and-a-half years in which the defendant's court-appointed attorney had (1) requested a competency evaluation; (2) received the results of the evaluation, which determined that the defendant was competent, but failed to share the results with the State and the district court for over eight months;

(3) requested a second competency evaluation; and (4) received the results of the second evaluation and again failed to share them with the State or the district court for nearly a year. *Id.* ¶ 20.

{36} Judge Pickard, writing for a unanimous Court, began by noting that a delay caused by a competency evaluation ordinarily should not count against the State because the evaluation is for the defendant's benefit. *Id.* ¶ 19. Nonetheless, the Court held that both parties shared responsibility for the delay. *Id.* First, the Court acknowledged "the general rule that a defendant must be held accountable for the actions of his or her attorneys," but it reasoned that the delays in the defendant's case, which had not been requested or consented to by the defendant, amounted to "neglect" by his attorneys. *Id.* ¶ 22. As such, the delays could not be held against the defendant for speedy trial purposes because they were "unreasonable and unnecessary" and "solely attributable to [defense] counsel." *Id.* ¶¶ 21-22.

{37} Second, *Stock* concluded that the "extraordinary delay [was] partially attributable to the State" because the State had done "little or nothing to ascertain what was happening in the case or to move the case forward." *Id.* ¶ 25. The Court observed, "It is ultimately the state's duty to make sure that defendants are brought to trial in a timely manner." *Id.* The Court therefore concluded that while the delay

23

was "technically attributable to [the defendant], because it was occasioned by his counsel pursuing or, more accurately, failing to pursue, the issue of his competency," the reasons for the delay weighed against the State because of its "failure to monitor the case and ensure that steps were being taken to bring [the defendant] to trial in a timely manner." *Id.* ¶ 29. Thus, the Court held on the one hand that the delays occasioned by defense counsel did not weigh against the defendant, and it held on the other hand that the particularly egregious delay weighed against the State because of its failure to push the case to trial.

{38} We find *Stock*'s reasoning compelling, particularly in a case like the one before us, when the delay is extraordinary and the defendant is detained while awaiting trial. Under such circumstances, we agree that it may be appropriate to shift the focus to the State's efforts to bring the case to trial, at least when the record demonstrates that the defendant did not affirmatively cause or consent to the delay. *Accord, e.g.*, *Barker*, 407 U.S. at 527 ("A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." (footnotes omitted)); *Maddox*, 2008-NMSC-062, ¶ 26 ("Because the State has the burden of bringing a case to trial, we will weigh unreasonable periods of delay against the State."); *State v. Marquez*, 2001-NMCA-062, ¶ 8, 130 N.M. 651, 29 P.3d

24

1052 ("It is primarily the responsibility of the State to bring a case to trial within a reasonable period of time.").

{39}     The State implies that *Stock* may be on shaky footing since the U.S. Supreme Court decided *Brillon*. We disagree. *Brillon* reversed the Vermont Supreme Court's holding that weighed the delay caused by appointed defense counsel's "'inaction' or failure 'to move [the] case forward'" against the State. *See* 556 U.S. at 92 (quoting *State v. Brillon*, 2008 VT 35, 955 A.2d 1108, 1111, 1112) ("An assigned counsel's failure 'to move the case forward' does not warrant attribution of delay to the State."). The United States Supreme Court faulted the Vermont Supreme Court's reasoning that assigned counsel are essentially state actors for purposes of a speedy trial claim because they are "part of the criminal justice system." *See id.* (quoting *Brillon*, 955 A.2d at 1121). The United States Supreme Court held, instead, that "the individual counsel here acted only on behalf of [the defendant], not the State," and counsel's conduct therefore must be attributed to the defendant under the general rule that "the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation." *Id.* at 90, 92 (alteration in original) (internal quotation marks and citation omitted). A contrary rule, the Court reasoned, could create an incentive for defense counsel "to delay proceedings by seeking unreasonable continuances." *Id.* at 93. The

25

Vermont Supreme Court's rule also would create an arbitrary and unjustified distinction between the conduct of appointed and privately retained defense counsel in speedy trial cases. *See id.*

{40} *Brillon* also held that the Vermont Supreme Court had failed to take into account the defendant's conduct during the first year of the proceedings against him. The United States Supreme Court noted that the defendant had sought to dismiss his first attorney on the eve of trial, had behaved stridently and aggressively toward, and had even threatened, his second attorney, and had sought the dismissal of a third attorney, despite the trial court's warning about delay. *See id.* The Court reasoned, "Just as a State's deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State], so too should a defendant's deliberate attempt to disrupt proceedings be weighted heavily against the defendant." *Id.* at 93-94 (alteration in original) (internal quotation marks and citation omitted). The Court therefore concluded that the delays in the case were the result of the defendant's "deliberate efforts to force the withdrawal of [his first two attorneys]," without which "no speedy-trial issue would have arisen." *Id.* at 94.

{41} We view *Brillon* as strengthening, rather than undermining, our Court of Appeals' holding in *Stock*. First, *Stock* did not transfer blame for defense counsel's

26

failure to move the case forward to the State based on a theory of state action. Rather, in attributing delay to the State, our Court of Appeals focused on the *State's* obligation to monitor and move the case forward and its failure to do so "during extraordinary periods of delay." 2006-NMCA-140, ¶ 29. This is an important distinction; *Brillon* did not forbid holding the State accountable for its own inaction, particularly in the face of its duty to bring a defendant to trial.

{42} Second, *Brillon*'s holding that the defendant's "deliberate attempts to disrupt proceedings" must weigh against him is nothing new. *See, e.g.*, *State v. Talamante*, 2003-NMCA-135, ¶ 14, 134 N.M. 539, 80 P.3d 476 (weighing delays against the defendant when he failed to appear at two arraignments and a hearing). *Stock* did not hold to the contrary, and instead considered the fairness of attributing to the defendant delays caused by defense counsel when the defendant was effectively blameless. The Court of Appeals' conclusion that such delay should not weigh against the defendant reflects the reality that the defendant has no duty to bring himself to trial. *See Barker*, 407 U.S. at 527.

{43} We therefore view *Stock* as an important, well-reasoned part of our speedy trial jurisprudence in cases when the delay is extraordinary and the defendant is held in custody. Accordingly, we adopt and extend *Stock*'s two-part approach for

27

determining whether the reasons for the delay in such a case should weigh against a defendant or the State. We first consider whether Defendant is to blame for the delays in this case because he has personally caused or acquiesced to the delay in his case. If not, then we consider whether the State has met its obligation to bring Defendant's case to trial.

**2.** ***Defendant did not cause or acquiesce in the continuances or extensions of time in his case***

{44} The State argues that the Court of Appeals correctly determined that Defendant caused the delays in his case by either failing to object to or agreeing to all of the continuances and extensions in his case and by twice seeking to substitute his counsel at crucial times during the proceedings. We consider each of these contentions in turn.

{45} The Court of Appeals' conclusion that Defendant either failed to object or agreed to all of the continuances and extensions in his case is not supported by the record.[1] To the contrary, the district court explicitly found that the evidence showed

---

[1]We also question the propriety of weighing extensions that are agreed to by both parties against Defendant. *See, e.g.*, *State v. Valencia*, 2010-NMCA-005, ¶ 21, 147 N.M. 432, 224 P.3d 659 (weighing the delay from "an agreed-upon continuance" neutrally). However, because we hold that Defendant did not agree to the extensions, we do not reach this issue.

28

that Defendant had "continually asserted his right to a speedy trial to his defense attorneys." That finding is not disputed on appeal, and it is supported by Defendant's uncontradicted testimony at the hearing on his motion to dismiss. Defendant testified that from the beginning of his case, he had insisted to his attorneys that he did not want to plead guilty and that he wanted to go to trial. Defendant also testified that he "never agreed to any of those extensions [in his case]" and that he only found out about them after they had been granted. While the district court was free to disregard Defendant's self-serving testimony, the court's finding demonstrates that it found Defendant credible when he testified that Mr. Ross and Mr. Pistone had stipulated to the State's requests *without* Defendant's consent.

{46}     We are mindful that the actions of defense counsel ordinarily are attributable to the defendant. *See Brillon*, 556 U.S. at 90-91. But when the evidence found by the district court shows that both defense counsel were acting contrary to Defendant's wishes when they agreed to the State's requests to delay the trial, we will not weigh their actions against Defendant. Applying the rule we have taken from *Stock*, we therefore hold that Mr. Ross's and Mr. Pistone's repeated stipulations to the State's requests to extend the time for commencing Defendant's trial do not weigh against Defendant because Defendant neither caused nor consented to those stipulations.

29

{47} The more difficult question is whether, by seeking substitute counsel, Defendant caused or consented to the delays in his case. We agree with the Court of Appeals dissent that this inquiry effectively pits Defendant's right to a speedy trial against his right to effective assistance of counsel, and he should not have to surrender one right to assert the other. *See Serros*, No. 31,565, mem. op. ¶ 74 (Zamora, J., dissenting); *cf., e.g., State v. Gutierrez*, 1995-NMCA-018, ¶ 19, 119 N.M. 618, 894 P.2d 395 ("'[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.'" (quoting *Simmons v. United States*, 390 U.S. 377, 394 (1968))). We therefore will only weigh Defendant's assertion of his right to effective assistance of counsel against him for speedy trial purposes if his assertion was unreasonable. Towards that end, we review the legal representation actually provided by each attorney to assess the reasonableness of Defendant's untimely efforts to remove them as counsel.

**3.** ***Defendant's motion to replace Mr. Ross as defense counsel was not unreasonable***

{48} Beginning with Mr. Ross, we already have noted the district court's finding that Mr. Ross had delayed Defendant's case by "schedul[ing] plea hearings when the defendant did not request them." The court, however, also found that Mr. Ross was

not ineffective under *Stock* because he "engaged in plea negotiations with the State, investigated the feasibility of a sex offender evaluation to assist in plea negotiations, and conducted a number of pre-trial interviews with the State's witnesses." We also note that the district court found that it had permitted Mr. Ross to withdraw because Defendant had filed a disciplinary complaint against him. When the court permitted Mr. Ross to withdraw, it explicitly found "no indication that [he had] not fully and effectively represented [Defendant]." The court therefore concluded that "any delay caused by the change of counsel be charged against [Defendant] for speedy trial purposes."

{49} Based on our review of the record and the evidence submitted at the hearing on Defendant's motion to dismiss, we conclude that Defendant's request to replace Mr. Ross as defense counsel was not unreasonable. It appears from the record that Mr. Ross did little in Defendant's case for over 17 months. His involvement, at least on paper, was limited to belatedly agreeing to the State's first petition to extend the time for commencing Defendant's trial, stipulating to three additional petitions to extend the time for commencing trial, and appearing at five plea hearings. Other than his entry of appearance, which included a one-sentence demand for a speedy trial, Mr. Ross did not file a single witness list, motion, response, or other pleading with the

31

district court before he was removed from the case in December 2008. And as of August 18, 2008, Mr. Ross had not requested or conducted any pretrial interviews, had not responded to a plea offer from the State, had refused a request by the State to obtain a sex offender evaluation, and was not prepared for the trial set for August 25, 2008, 17 months after Defendant's arrest.

{50} Defendant's testimony at the hearing on his motion to dismiss supports our view of the record about Mr. Ross's performance. Defendant testified that Mr. Ross never answered or returned Defendant's telephone calls, never responded to Defendant's requests to see the discovery in his case, never mentioned the possibility of a sex offender evaluation, and never showed Defendant "plea paperwork." Defendant also testified that on the occasions when he met with Mr. Ross, "all [Mr. Ross] would ask [Defendant] to do" was accept a plea offer from the State, to which Defendant consistently responded that he did not want to plead guilty and that he wanted to go to trial.

{51} Defendant filed a pro se motion to appoint substitute counsel on October 23, 2008, and he admitted during cross-examination that he had sent a letter to the Disciplinary Board complaining about Mr. Ross's performance in the case shortly after filing his pro se motion. These filings followed the fifth plea setting that Mr.

32

Ross had scheduled against Defendant's wishes, which took place on October 14, 2008. At that hearing, Defendant insisted to the district court, to Mr. Ross, and to the State that he did not want to accept a plea offer and that he wanted to go to trial. Defendant alleged in his motion that he "ha[d] reason to believe . . . that [Mr.] Ross [was] not able to adequately represent the defendant's interests." And he wrote in his letter to the Disciplinary Board that "[Mr. Ross] only wants to offer me plea bargains and keeps requesting extensions of time without my consent."[2]

{52}     Defendant also admitted on cross-examination that unbeknownst to him, Mr. Ross had conducted a number of witness interviews in November 2008.[3] Defendant denied having any knowledge of these witness interviews until Ms. Kerr entered the case. Defendant also admitted that when he filed his motion to appoint substitute counsel in October 2008, he was aware that a trial had been set for December 1, 2008,

[2]The hearing transcripts indicate that Mr. Ross consented to sharing his disciplinary file with the district court and the parties. Defendant's letter to the disciplinary board, however, was not formally entered into evidence. Ms. Kerr read the language quoted above into the record without objection during her closing argument on the motion to dismiss.

[3]Based on the State's representations, it appears that Mr. Ross interviewed as many as ten witnesses in November 2008 but that he had not yet interviewed the victim or the victim's caregivers, including the victim's mother who had reported the alleged abuse.

that the State had indicated that it would be ready to proceed to trial by that date, and that Defendant proceeded nonetheless with his motion to appoint substitute counsel, which the district court granted on December 1, 2008.

{53} We are troubled by Defendant's decision to ask the district court to replace Mr. Ross on what amounted to the eve of trial, and we acknowledge that other courts, including our Court of Appeals, have heavily weighed such a choice against the defendant. *See, e.g.*, *Fierro*, 2012-NMCA-054, ¶ 40 (attributing to the defendant over two years of delay that followed his request to change counsel less than a month before trial); *see also Brillon*, 556 U.S. at 93-94 (holding that the defendant's dismissal of his first attorney on the eve of trial was a "deliberate attempt to disrupt proceedings" that weighed heavily against him). Generally speaking, such last-minute pleas to change counsel should be reviewed skeptically.

{54} But under the circumstances of this case, we hold that Defendant's motion to replace Mr. Ross was not unreasonable. The district court credited Defendant's testimony that Mr. Ross had failed to consult with him, and had failed to heed his wishes about whether to negotiate a plea agreement and whether to agree to continuances or extensions of time. The district court also accepted the State's time line of events in the case, which reflected that the State had sent its plea offer to Mr.

34

Ross in January 2008 and that the last plea hearing in the case occurred on October 14th, 2008, nearly nine months later. And although Mr. Ross did not testify at the hearings on Defendant's motion to dismiss, Ms. Kerr reported during closing arguments—without objection from the State—her conversation with Mr. Ross that corroborated Defendant's testimony. Specifically, Mr. Ross had admitted that Defendant had said from the beginning that he did not want a plea bargain and that he wanted to go to trial.[4] According to Ms. Kerr, Mr. Ross also admitted that he kept asking for plea settings for Defendant because he "was hoping that he could talk [Defendant] into it." While allegations of counsel generally are not considered evidence, *see, e.g.*, *Spearman*, 2012-NMSC-023, ¶ 39, we note that Mr. Ross's purported recollection is consistent with Defendant's own testimony, and the State did not provide any evidence to the contrary.

{55} Mr. Ross's failure to heed Defendant's repeated refusals to accept a plea offer, as found by the district court, and conceded by defense counsel himself, raises serious concerns about the adequacy of his representation. *See, e.g.*, Rule 16-104 NMRA (providing that a lawyer shall, among other things, "reasonably consult with the client

---

[4]We note that at the district court's request Mr. Ross appeared at the second hearing on Defendant's motion to dismiss, but for reasons we cannot fathom, he was not asked to testify, nor was he directed to appear at a subsequent hearing.

about the means by which the client's objectives are to be accomplished"; "keep the client reasonably informed about the status of the matter"; and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). It also undermines the district court's findings that Mr. Ross was not ineffective in part because he had "engaged in plea negotiations with the State [and had] investigated the feasibility of a sex offender evaluation to assist in plea negotiations."[5] These efforts, irrespective of whether Mr. Ross communicated them to Defendant, were contrary to Defendant's express wishes that he did not want to accept a plea offer and that he wanted to go to trial. And as we previously have observed, the record is devoid of any other efforts by Mr. Ross to prepare for trial until after Defendant filed his motion to appoint substitute counsel. Thus, at the time that Defendant filed his motion, all that he had to show for Mr. Ross's 17 months of representation—17 months in which Defendant had been held in custodial

---

[5]The record is inconsistent about who actually raised the possibility of a sex offender evaluation in this case. The issue first arose in a February 2008 order in which the district court continued the March 2008 trial setting because the "[d]efense [was] requesting an evaluation." In the subsequent stipulated motion to extend the time limit for commencing trial, the State represented to the district court that "Defense counsel is still evaluating the case in an effort to determine whether an evaluation of his client is in order." Five months later, the State represented to this Court that Mr. Ross had refused *the State's* request for a sex offender evaluation.

36

segregation—were Mr. Ross's repeated, unwelcome attempts to convince Defendant to accept a plea bargain.

{56} Without commenting on the actual level of Mr. Ross's preparation for trial or whether his representation was constitutionally effective, under the circumstances of this case, we do not fault Defendant for seeking to have Mr. Ross replaced less than six weeks before a trial setting, regardless of the State's preparedness for trial. Based on the evidence presented on Defendant's motion to dismiss and on the district court's finding that Mr. Ross had delayed Defendant's case by requesting plea settings when Defendant did not want them, Defendant's allegation in his motion to appoint substitute counsel that he "ha[d] reason to believe . . . that [Mr.] Ross[] is not able to adequately represent the Defendant's interests" was not unreasonable. Finding no indication that Defendant either caused or acquiesced in the delays during Mr. Ross's representation, we hold that this period of time does not weigh against Defendant.

**4.** ***Defendant's attempt to replace Mr. Pistone was not unreasonable***

{57} Turning to Mr. Pistone's representation of Defendant, we note that the district court concluded that he was ineffective under *Stock* based on two explicit findings. First, the court found that Mr. Pistone had sought and obtained a stay in the case

37

pending a determination of Defendant's competency ten days before a July 2009 trial setting, without taking steps to obtain an evaluation over the course of the ensuing five months. And second, the district court found that Mr. Pistone had filed a motion to withdraw from the case based on Defendant's alleged filing of both a pro se motion to appoint substitute counsel and a disciplinary complaint, neither of which were actually filed.

{58}   We view the district court's conclusion that Mr. Pistone was ineffective under *Stock* as a determination that the delays occasioned by his neglect of Defendant's case should not weigh against Defendant. Based on our review of the record, the district court's conclusion was well-founded. Over the course of 14 months as Defendant's attorney, Mr. Pistone filed three documents in the case. The first two were his entry of appearance and his demand for evidence and a speedy trial, both of which were filed on January 23, 2009. The third was his motion to withdraw as counsel, which he filed on January 4, 2010. In the intervening year, the only activity in the case was a notice that Defendant's trial had been rescheduled for July 20, 2009, an accompanying petition and order granting the State's fifth request for an extension of time, and an order entered on July 10, 2009, staying the proceedings pending an evaluation of Defendant's competency. The July 10, 2009, order remained in effect

until October 18, 2010, effectively preventing any chance of Defendant's case going to trial during that time.

{59}     At the hearing on Defendant's motion to dismiss, Defendant testified that Mr. Pistone never met, spoke, or corresponded with him during the 14 months he spent as Defendant's attorney. Defendant learned from his MDC caseworker that Mr. Pistone had been assigned to the case, and after looking up Mr. Pistone's telephone number in the Yellow Pages, Defendant called Mr. Pistone's office about 12 times to request discovery. Defendant also testified that he learned from Mr. Pistone's assistant after the July 2009 trial setting had passed that his case had been stayed because the State had requested a competency evaluation, and that "it was up to [Defendant] whether [he] wanted to take it or not." Defendant testified that he told Mr. Pistone's assistant that he "felt . . . fully competent and [that he] felt kind of insulted, as well." According to Defendant, neither Mr. Pistone nor his assistant ever explained to Defendant the purpose of a competency evaluation or why Mr. Pistone or the State believed that a competency evaluation was necessary.

{60}     Defendant also testified that the only time that he actually met Mr. Pistone was at the hearing in March 2010, "the day when he said he was going to not represent [Defendant] anymore." Mr. Pistone had filed a motion to withdraw as counsel on

39

January 4, 2010, claiming that Defendant had filed a bar complaint against him, was filing pro se motions, and was not complying with him. Defendant confirmed at the hearing on his motion to withdraw that he had filed a disciplinary complaint against Mr. Pistone "around the middle or towards the end of 2009" because Mr. Pistone was not communicating with him or undertaking any efforts in his defense. Defendant also testified that he had filed "another [motion to] substitute counsel" after about nine months of being represented by Mr. Pistone because he had not heard from Mr. Pistone and because he kept getting the runaround from Mr. Pistone's assistant. The district court was unable to find a record of either of these documents while it was considering Defendant's motion to dismiss, despite Mr. Pistone's grudging consent to view his disciplinary file.[6]

{61} The district court granted Mr. Pistone's motion to withdraw after a hearing on March 24, 2010, at which Defendant was present but did not testify. The only evidence presented at that hearing were Mr. Pistone's representations parroting the allegations in his motion to withdraw. Although the court did not issue any formal

---

[6]We note that like Mr. Ross, Mr. Pistone appeared at the second hearing on Defendant's motion to dismiss at the district court's request, but for reasons we cannot fathom, also like Mr. Ross, Mr. Pistone was neither asked to testify nor directed to appear at a subsequent hearing.

findings in its order granting Mr. Pistone's motion, it cautioned Defendant from the bench, stating "Mr. Serros, let me advise you that the next attorney you get, you're stuck with. I'm not going to play this game with you, so that's the way it's going to be. Your next attorney, whether you like him or her, ain't gonna matter." After taking evidence on Defendant's motion to dismiss approximately 15 months later, the district court revised its position when it dismissed Defendant's case, stating "I will tell you now, if I knew then what I know now, I would have never allowed Mr. Pistone to withdraw from the case."

{62}    We have little trouble concluding that the delay occasioned by Mr. Pistone should not weigh against Defendant. As the district court observed, during the time of Mr. Pistone's representation of Defendant, "absolutely nothing was filed, no witnesses were interviewed, and a competency evaluation was asked for approximately a week to ten days prior to the trial setting in this case." The record supports the district court's finding that Mr. Pistone delayed Defendant's case by raising the question of Defendant's competency and then failing to pursue an evaluation once the case had been stayed. Allowing Defendant's case to languish for six months after the stay was entered—when Defendant already had been detained for nearly two and a half years in custodial segregation—is inexcusable. And then

41

letting another two months of inactivity slip by after filing a motion to withdraw shows utter disregard on Mr. Pistone's part for Defendant's circumstances.

**{63}** We acknowledge that it is not clear in the record whether Defendant actually filed either a motion to replace Mr. Pistone or a disciplinary complaint against him. The absence of these documents from court records and from Mr. Pistone's disciplinary file apparently troubled the district court, given its decision to permit Mr. Pistone to withdraw from the case. But even assuming that Mr. Pistone's motion to withdraw was prompted by Defendant's filing of such documents, we conclude again that, based on the circumstances, Defendant's actions were not unreasonable. We therefore hold that none of the delays during the period that Mr. Pistone represented Defendant weighs against Defendant.

**5.** ***Defendant did not cause or acquiesce in the delays during Ms. Kerr's representation***

**{64}** The district court's findings about the delays during Ms. Kerr's representation of Defendant were limited to her role in obtaining a competency evaluation. The court found that Ms. Kerr was appointed after the withdrawal of Mr. Pistone, and that although she did not believe that Defendant was incompetent, she investigated whether a competency evaluation had been done because a stay was in place pending

42

a determination of Defendant's competency. Upon learning that Mr. Pistone had neither arranged nor requested an evaluation of Defendant's competency, Ms. Kerr sought an expedited competency evaluation, in which Defendant was deemed competent to proceed. The district court drew no conclusions from these findings.

{65}    The Court of Appeals majority concluded that Ms. Kerr was not responsible for any of the delay in Defendant's case. However, the Court held without explanation that all but three months of the time that Ms. Kerr represented Defendant weighed heavily against him. *See Serros*, No. 31,565, mem. op. ¶¶ 34, 38. It appears implicitly that the Court faulted Defendant for "caus[ing] the delay by trying to have Mr. Pistone removed from the case." *See id.* ¶ 38; *see also Fierro*, 2012-NMCA-054, ¶ 40 (weighing over two years of delay against the defendant because his requests for new counsel at crucial times in the case required "repeated continuances so defense counsel could adequately prepare a defense"). As for the remaining three months, the Court held that the period from March to June 2011, in which the district court "set four separate hearings on the motion [to dismiss]," counted as negligent delay that weighs against the State. *See Serros*, No. 31,565, mem. op. ¶ 34.

{66}    We see nothing in the record during the time of Ms. Kerr's representation of Defendant to suggest that Defendant either caused or acquiesced in delays during that

43

period of time. Ms. Kerr entered her appearance and demand for a speedy trial on May 19, 2010, along with a witness disclosure and a notice of discovery demand. Five months later, Ms. Kerr filed Defendant's motion to dismiss, and the district court entered an order lifting the stay because Defendant's competency had been evaluated and Ms. Kerr was satisfied that Defendant was competent to stand trial. Defendant testified at the hearing on his motion to dismiss that he had agreed to have his competency evaluated "right away, just to make things start going on" after Ms. Kerr had explained to him that the case "couldn't move forward without that exam or evaluation." The period of time from October 2010 until the first hearing on Defendant's motion to dismiss on March 23, 2011, resulted from the district court's settings and resettings of the hearing due to Ms. Kerr's unexpectedly long recovery from a medical procedure and from the district court's calendaring process. Given the advanced state of the proceedings and Defendant's cooperation with Ms. Kerr during this period, we do not weigh this time against Defendant.

{67}     Finally, we consider the three months that the district court took to hear evidence and render a decision on Defendant's motion to dismiss. The State contends that the Court of Appeals improperly weighed this period of time against the State because the hearings were continued as a result of Defendant's failure to meet his

44

burden on his claims of ineffective of counsel. Based on our review of the proceedings and the cases cited by the State, we disagree. The delays were caused by the State's failure to call Mr. Ross and Mr. Pistone to testify at the first hearing, by the district court's subsequent attempts to secure their testimony and their disciplinary files, and by the district court's taking the matter under advisement for a month before it ruled on the motion to dismiss. The Court of Appeals correctly determined that the three-month delay was negligent delay that weighs against the State.

### 6.       *The State negligently failed to move Defendant's case to trial*

{68}       Having concluded that Defendant did not unreasonably cause or consent to the delays in this case, we address whether the State met its obligation to move Defendant's case to trial. We agree with the district court that nothing in the record suggests that the State intentionally delayed Defendant's trial or interfered with his right to a speedy trial. In fact, the State appears to have diligently pursued its case during the time that Mr. Ross represented Defendant. In that time, the State made numerous discovery disclosures, filed a witness list which it amended several times, pursued DNA analysis, investigated a possible recantation by the victim, put together a plea offer in consultation with the victim's family, and interviewed and prepared witnesses for trial. While the State's efforts are less apparent during the time that Mr.

45

Pistone and Ms. Kerr represented Defendant, its inactivity can be explained, at least somewhat, by the State's contention that it was prepared for trial on December 1, 2008.

{69}  At the same time, we note that the State filed all five of its petitions to extend the time to commence Defendant's trial in this case. In each petition, the State represented that Defendant had been detained since the date of his arrest, and it presented a detailed description of the work in the case that had yet to be completed before it could go to trial. It was the State that filed the August 18, 2008 petition in this Court—over 17 months after Defendant's arrest—reporting a near-total lack of preparation for trial by Mr. Ross. Thus, the State was intimately aware of the status of Mr. Ross's trial preparations, yet it effectively enabled his neglect of Defendant by seeking more time to bring him to trial. When pressed by the district court about why the State had not "push[ed] the case," the State responded that until the plea hearing on October 14, 2008, it believed that "this case would probably plea." We acknowledge the crucial role that plea negotiations play in our criminal justice system, but it is well settled that the possibility of a plea agreement does not relieve the State of its duty to pursue a timely disposition of the case. *See Maddox*, 2008-NMSC-062, ¶ 26 ("The State must affirmatively seek to move the case to trial, even

while plea negotiations are pending.").

{70}    As for the time that Mr. Pistone represented Defendant, the State similarly assumed responsibility for postponing the case. Shortly after Mr. Pistone was appointed, the State filed its fifth petition for an extension on February 16, 2009, explaining that Mr. Pistone had left the state shortly after being assigned to the case to tend to his father, who was ill. The State also prepared and submitted the order staying the case pending an evaluation of Defendant's competency after meeting with Mr. Pistone and learning that he would not be ready for the July 2009 trial setting. Over the course of the ensuing five-and-a-half months, nothing happened in the case until Mr. Pistone filed his motion to withdraw, and it took another two months before the State requested a hearing on Mr. Pistone's motion and the status of Defendant's competency evaluation. We cannot condone the State's permitting more than eight months to pass from July 2009 until March 2010 with full knowledge that Defendant had been detained since March 2007.

{71}    Another aspect of the State's conduct that influenced this case, and therefore deserves scrutiny, is its policy to restrict interviews of the victim and the victim's family in cases with allegations of sexual abuse. The State alluded to this policy during its cross-examination of one of Defendant's witnesses at the hearing on

Defendant's motion to dismiss. The witness, an experienced defense attorney, testified that in sexual abuse cases involving child victims, it is important to interview the victim and the victim's family early in the process because a child's memory, in particular, "is susceptible to the passage of time."

State: Now, you also mentioned that in sex offense cases, the thing that you want to do is talk to family members and the child fairly early on; is that right?

Witness: Yes.

State: Are you aware of the policy or the procedure, basically, of the District Attorney's Office to try to negotiate a case prior to an interview with the child to avoid the trauma of the child coming to an interview?

Witness: Sure. I'm not aware of that, but I can imagine why you would do that.

State: And in this case, you're aware that the child was about four at the time of the disclosure?

Witness: Yes.

Though the policy's precise contours are unclear, Mr. Ross purportedly delayed requesting interviews during plea negotiations because he believed that if he had asked the State to permit him to interview the victim, the State would not have extended any kind of a plea offer to Defendant. Ms. Kerr similarly explained that the

48

State had informed her that it "would rather not provide the child and the very important witnesses [to be interviewed] until and unless you're going to trial." The State acknowledged that it had prevented Ms. Kerr from interviewing the victim while Defendant's speedy trial motion was pending to avoid "pressure from the family."

{72} We are mindful of the need to avoid re-traumatizing victims and their families. This case, however, illustrates the havoc that such a policy can wreak on an accused's right to a speedy trial. The district court summed up the problem at the hearing on Defendant's motion to dismiss: "And so defense attorneys are saying . . . , 'Well, how the hell am I supposed to know if I should seek a plea deal for my client when I don't know what the evidence is?'" Indeed, to this day, Defendant has never had the opportunity to interview the critical witnesses in his case.

{73} In light of the State's actions, we conclude that the State at least shares blame for the extraordinary delay in this case. On the one hand, the State enabled Mr. Ross's and Mr. Pistone's neglect of Defendant's case by repeatedly requesting to delay Defendant's trial on their behalf. On the other hand, the State's policy of restricting interviews of the victim and the victim's family effectively prevented Defendant's attorneys from fully developing a defense; that policy contributed to their delay in

preparing for trial. We stress that nothing in the record hints that the State's actions were deliberately aimed at delaying Defendant's trial. However, we hold that in light of the State's obligation to bring Defendant to trial, its actions amounted to negligent delay. And given the extraordinary length of the delay, we hold that this factor weighs heavily against the State. *See Garza*, 2009-NMSC-038, ¶ 26 ("The degree of weight we assign against the State for negligent delay is closely related to the length of delay: '[O]ur toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial.'" (quoting *Doggett*, 505 U.S. at 657)).

{74}     Thus, looking at the reasons for the delay as a whole under the approach that we have adopted from *Stock*, we hold that Defendant was not responsible for the extraordinary delay in this case. He did not affirmatively cause or acquiesce in the delays in his case, and his attempts to replace Mr. Ross and Mr. Pistone were not unreasonable based on the district court's findings and the evidence presented on Defendant's motion to dismiss. We acknowledge that much of the evidence was one-sided because neither Mr. Ross nor Mr. Pistone testified. However, the State was given the opportunity to call the two attorneys as witnesses at the close of Defendant's evidence and it expressly declined to do so. The State also made no

50

effort to question them when they appeared before the district court at the second hearing on Defendant's motion to dismiss. Finally, the State did not object at the third hearing on the motion to dismiss when the district court and Ms. Kerr agreed that it was not necessary to call Mr. Ross or Mr. Pistone to testify because both men had agreed to disclose their disciplinary files. The State therefore was largely responsible for the lack of evidence in the record to contradict Defendant's testimony if, in fact, such evidence existed. Moreover, the district court remained free to disregard Defendant's testimony, yet the court still found much of it to be credible. Under these circumstances, we defer to the district court's findings, and we do not weigh the reasons for the delay against Defendant.

{75} We also hold that the State negligently failed in its duty to bring Defendant to trial, and that because of the extended nature of the delay, this factor weighs heavily against the State. We emphasize that our holding is based on the State's conduct in this proceeding, which we hold contributed to the extraordinary delay in this case.

**C.    Assertion of the right**

{76} Under the third factor, whether Defendant asserted his right to a speedy trial, we "accord weight to the 'frequency and force' of the defendant's objections to the delay[, and we] also analyze the defendant's actions with regard to the delay." *Garza*,

51

2009-NMSC-038, ¶ 32 (quoting *Barker*, 407 U.S. at 529). "[T]he timeliness and vigor with which the right is asserted may be considered as an indication of whether a defendant was denied needed access to [a] speedy trial over his objection or whether the issue was raised on appeal as [an] afterthought." *Id.*

{77} The district court found that, "[a]lthough [Defendant] did not specifically enter a pleading on his behalf, the evidence shows that [he] continually asserted his right to a speedy trial to his defense attorneys, although he never asserted that right to the State or the Court until the filing of the [motion to dismiss]." We note initially that part of this finding is contradicted by the record. As we previously explained, each of Defendant's three court-appointed attorneys filed a demand for a speedy trial when each entered an appearance on his behalf. Although these were pro forma assertions of the right, they still are entitled to some weight. *See, e.g.*, *Garza*, 2009-NMSC-009, ¶ 34 (holding that a single demand for a speedy trial, "tucked within the waiver of arraignment and not guilty plea," was sufficient to assert the defendant's right and weighed slightly in the defendant's favor because there was no evidence that the defendant had acquiesced to the delay). We therefore reverse the district court's finding that Defendant did not assert his right to a speedy trial to the district court until he filed his motion to dismiss.

52

{78} The more difficult question is whether the district court correctly concluded that Defendant had asserted his right to a speedy trial to his attorneys. The Court of Appeals majority concluded that this factor did not weigh in Defendant's favor because (1) the demands for a speedy trial were pro forma and entitled to minimal weight, (2) Defendant had "either stipulated to, moved for, or failed to object to any of the State's requested continuances or extensions of time," (3) Defendant had filed a pro se motion to appoint substitute counsel "in late October 2008, knowing that his trial was scheduled for December 1, 2008, and that the State was prepared to proceed," and (4) Defendant had failed to assert his right to a speedy trial at either hearing to appoint substitute counsel. *Serros*, No. 31,565, mem. op. ¶¶ 40-41. The Court of Appeals also specifically disregarded the district court's finding that Defendant had asserted his right to a speedy trial to his attorneys because it "came only from Defendant himself at the hearing on his motion to dismiss." *Id.* ¶¶ 27, 42.

{79} We take a different view of the record on this factor than did the Court of Appeals majority. We initially see a distinction in this case between *Defendant* agreeing to the State's requests to extend the time for commencing his trial and *Defendant's attorneys* agreeing to such requests. As we explained in our analysis of the reasons for the delay, there was ample evidence from which the district court

53

could have concluded—and did conclude—that Defendant did not agree to the requests to extend the time for commencing his trial. The State offered no evidence to the contrary.

{80} Defendant introduced less evidence of his efforts to assert his right to a speedy trial to Mr. Pistone, but he testified that he repeatedly attempted to contact Mr. Pistone's office and view the discovery in his case. He also testified that, when he learned from Mr. Pistone's assistant that he would not be going to trial in July 2009 because the State had raised a question of his competency, he responded that he did not want a competency evaluation and that he just wanted to go to trial. The district court implicitly found this testimony credible, and we defer to that finding.

{81} But perhaps the clearest example of Defendant's efforts on this factor were his motion to appoint substitute counsel and his disciplinary complaint against Mr. Ross.[7] Defendant filed both documents in the aftermath of the fifth plea setting requested by Mr. Ross, at which Defendant insisted to the court, Mr. Ross, and the State that he did

---

[7]Defendant also testified that he had filed a disciplinary complaint and a pro se motion to substitute counsel against Mr. Pistone because he could not get in touch with him and he kept getting the runaround from Mr. Pistone's assistant. Mr. Pistone referred to these filings in his motion to withdraw; however, neither the disciplinary board nor the district court could find any record of these documents. We therefore do not rely on them as evidence of Defendant's efforts to assert his right to a speedy trial.

not want to plead guilty and that he wanted to go to trial. Defendant stated in his motion to dismiss that he believed that Mr. Ross was "not able to adequately represent [his] interests" in the case, and his disciplinary complaint elaborated on that point: "[Mr. Ross] only wants to offer me plea bargains and keeps requesting extensions of time without my consent." As we previously explained, we do not fault Defendant for filing the motion and complaint "knowing that his trial was scheduled for December 1, 2008, and that the State was prepared to proceed." *Serros*, No. 31,565, mem. op. ¶ 40. Under these circumstances, we view Defendant's motion and complaint as clear—though perhaps misguided—attempts to assert his right to a speedy trial, while also seeking to assert his right to effective assistance of counsel. As the Court of Appeals dissent observed, these rights should not be mutually exclusive. *See id.* ¶ 74 (Zamora, J., dissenting) ("A defendant should not be put in a position to have to choose between proceeding with his criminal trial with inadequately prepared legal counsel and the possibility of waiving his right to a speedy trial by filing a pro se motion to have his ill-prepared legal counsel removed from his case.").

{82} We also are not concerned by the district court's initial rulings that expressly weighed any delay against Defendant resulting from the substitutions of counsel.

55

Over the course of the hearing on Defendant's motion to dismiss, the district court retreated from its prior findings as more information came to light about Mr. Ross's and Mr. Pistone's representation of Defendant. Regarding Mr. Pistone, the district court expressly stated at the hearing granting Defendant's motion to dismiss, "I will tell you now, if I knew then what I know now, I would have never allowed Mr. Pistone to withdraw from the case." We therefore do not afford much deference to the district court's earlier pronouncements.

{83} In sum, we conclude that Defendant asserted his right to a speedy trial throughout the proceedings in the best way he knew. That Mr. Ross and Mr. Pistone did not further Defendant's efforts should not be held against him. Consequently, we weigh this factor in Defendant's favor.

**D.    Prejudice**

{84} Regarding the fourth and final factor, whether Defendant has suffered prejudice from the delay in bringing his case to trial, we analyze three interests that are affected by the right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Garza*, 2009-NMSC-038, ¶ 35 (quoting *Maddox*, 2008-NMSC-062, ¶ 32).

{85} The third interest, which *Barker* characterized as the "most serious," protects the defendant's ability to assert an adequate defense at trial from the prejudicial effect of the passage of time, such as the death or disappearance of a witness or the loss of memory. *Garza*, 2009-NMSC-038, ¶ 36 (quoting *Barker*, 407 U.S. at 532). A defendant who claims this type of prejudice must show "with particularity what exculpatory [evidence] would have been offered [and] that the delay caused the [evidence's] unavailability." *Id.* (quoting *Jackson v. Ray*, 390 F.3d 1254, 1265 (10th Cir. 2004)).

{86} Ordinarily, a defendant bears the burden of proof on this factor by showing "particularized prejudice" when claiming a speedy trial violation. *Garza*, 2009-NMSC-038, ¶ 39. However, "if the length of delay and the reasons for the delay weigh heavily in defendant's favor and defendant has asserted his right and not acquiesced to the delay, then the defendant need not show prejudice for a court to conclude that the defendant's right has been violated." *Id.*

{87} We already have determined that the first three factors weigh heavily in Defendant's favor, and we therefore need not consider whether Defendant has made a particularized showing of prejudice. We address this factor, however, to clarify what we view as a misapplication of the law by the Court of Appeals majority, which

57

concluded that Defendant had failed to show that he was prejudiced by the extreme delay in his case.

{88} We start with the district court's conclusion that, "[t]he fact that [Defendant had] been in custody in segregation for almost four and one-half (4-1/2) years with no adjudication, resulted in extreme prejudice." This conclusion was based on Defendant's *unchallenged* testimony at the hearing on his motion to dismiss, in which he described his living conditions for the previous four years. Defendant testified that, from the time that he was first incarcerated, he had been segregated and placed in protective custody "without [his] request or knowledge of where [he] was going." He described being held alone in a private cell, except for two 20-minute periods per day in which he was permitted to tend to his personal needs, such as bathing, cleaning his cell, and attempting to communicate with his attorneys or his family. Defendant also explained that as a result of being placed in segregation, he did not have access to the educational programs, library time, or recreational time available to the inmates housed with the jail's general population. He further testified that he had made written requests to be moved out of segregation "all the time" "because of the way the inmates . . . in segregation are treated, but because of the nature of [his] charges, . . . [jail officials wouldn't] allow [him] to move." And Defendant testified that he had

been subjected to "a lot" of sexual, physical, and verbal harassment; that he had been labeled a "Chester" (a slang term for child molester) by his fellow detainees and by MDC officials; and that he had been physically attacked by other inmates in his pod because he is gay.

{89} For the first two interests relevant to our prejudice inquiry, avoiding oppressive pretrial incarceration and minimizing anxiety and concern of the accused, we have noted that, because "'[s]ome degree of oppression and anxiety is inherent for ever[y] defendant who is jailed while awaiting trial'," we only find prejudice when the defendant makes a "particularized showing" that the "pretrial incarceration or the anxiety suffered is undue." *Garza*, 2009-NMSC-038, ¶ 35 (quoting *Maddox*, 2008-NMSC-062, ¶ 32) (alterations in original). "The oppressive nature of the pretrial incarceration depends on the length of incarceration, whether the defendant obtained release prior to trial, and what prejudicial effects the defendant has shown as a result of the incarceration." *Id.*

{90} Defendant's testimony easily establishes that the delay in his case caused him to suffer oppressive pretrial incarceration. It is undisputed that, because Defendant could not afford to pay his $150,000 bond, he was incarcerated for over four years without an adjudication of guilt, a length of time that we hold is oppressive on its

59

face.[8] *Cf., e.g.*, *id.* ¶ 37 (holding that the defendant had not established prejudice when he was held for two hours before he was released on bond). That Defendant was held in segregation for all of that time only compounds the prejudicial effect of his excessive pre-trial incarceration.

{91} The Court of Appeals majority concluded that Defendant's four-year placement in segregation was not oppressive because he was "placed in protective custody for his own safety" and because "the two attacks . . . were isolated incidents." *Serros*, No. 31,565, mem. op. ¶ 46. To the extent the majority was suggesting that Defendant was better off in segregation than with the general population, Defendant's testimony that he repeatedly requested to be transferred out of protective custody contradicts that notion. This testimony also suffices to establish prejudice to the second interest, that the delay caused Defendant to suffer undue anxiety and concern. It does not take much empathy to see the anxiety and concern that Defendant suffered from being held

---

[8]We recently reaffirmed that "the New Mexico Constitution requires that '[a]ll persons shall . . . be bailable by sufficient sureties' and that '[e]xcessive bail shall not be required.'" *State v. Brown*, 2014-NMSC-038, ¶ 21 (quoting N.M. Const. art. II, § 13). This case illustrates the dangers of requiring excessive bail. Nothing in the record suggests that either Defendant or society in general benefitted from locking up Defendant for over four years because he could not afford his bond. *Contra Fierro*, 2012-NMCA-054, ¶ 58 (concluding that the defendant's 55 months in solitary confinement was not prejudicial because it was "for [his] own safety" and because he had threatened the victim and her family).

60

alone in a cell for more than 23 hours a day, for over four years. The psychological, physical, and emotional effects of solitary confinement have been well documented. *See, e.g.*, *Davis v. Ayala*, ___ U.S. ___ (2015), 135 S. Ct. 2187, 2209 (Kennedy, J., concurring) ("Years on end of near-total isolation exact a terrible price." (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 334-36 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors)). We will not presume to second-guess Defendant's preference to be granted freedom from the confines of his cell.

{92}     As for prejudice to the third interest, Defendant's ability to present an adequate defense, the length of the delay again was enough to meet Defendant's burden under the circumstances of this case. The Court of Appeals majority concluded that Defendant had failed to identify specific exculpatory evidence that was lost due to the passage of time. While that may be true, Defendant established that the victim in this case was four years old at the time of the alleged abuse, and that in the subsequent four years that Defendant's case sat untried—a period of time in which the victim's age doubled—the State did not permit Defendant to interview either the victim or the victim's family members. As a result, the only contemporaneous account of the

incident was the victim's recorded safehouse interview, which was not subject to cross-examination. We are persuaded that the passage of over four years without the ability to interview the victim or the victim's family, particularly in light of the victim's very young age, was sufficient to demonstrate that the delay would have prejudiced Defendant's ability to present an adequate defense if his case had gone to trial.

{93}     In sum, we agree with the district court that Defendant's four years and three months in custodial segregation without a trial resulted in extreme prejudice.

**E.     Balancing the factors**

{94}     We hold that the extreme length of the delay in this case of over four years, coupled with Defendant's incarceration in custodial segregation for the entire time, resulted in extreme prejudice to Defendant and established a presumption that his right to a speedy trial was violated. We further hold that the reasons for the delay do not weigh against Defendant, but they weigh heavily against the State, and that Defendant adequately asserted his right to a speedy trial under the circumstances of this case.

{95}     In reaching this conclusion, we acknowledge that we have never before considered the Court of Appeals' holding in *Stock*, except in *Stock* itself, in which we

62

granted review and later quashed our writ of certiorari. *See* 2006-NMCA-140, *cert. granted*, 2006-NMCERT-011, *cert. quashed*, 2007-NMCERT-001. *Stock* and this case teach that as the delay mounts in bringing a defendant to trial, the State's obligation to alert the district court becomes increasingly pressing, especially when the defendant is held in custody awaiting trial. Ideally, the State, the defendant, defense counsel, and the district court all would be aligned in their efforts to bring the defendant to trial in a timely fashion.

{96} We acknowledge that there are times when defense counsel may prefer delay in the best interests of his client. When the client expressly concurs, that delay will continue to be attributed to the accused. But it is the State that is ultimately tasked with bringing the accused to trial in a timely manner. Accordingly, we do not deem it unfair to impose upon the prosecution the burden of monitoring the progress of the case and, at some point, alerting the trial court of potential speedy trial consequences.

{97} That does not relieve the remaining participants from their own obligations to protect the constitutional rights of the accused. But it is uniquely the duty of the prosecution—as the State's representative—to ensure that the accused is prosecuted in a manner consistent with the Constitution. This is no less true for the right to a "speedy and public trial" under the Sixth Amendment than it is for the right to

counsel and confrontation under that same amendment, and the rights against self-incrimination under the Fifth Amendment and against unreasonable searches and seizures under the Fourth Amendment. The State must ensure that justice is done.

{98} That means that at some point the delay simply becomes intolerable. As Judge Schwartz, himself formerly a longtime district attorney, explained when he dismissed this case: "[U]nfortunately, it's the duty of the State to work both sides of the street sometimes." Although perhaps inelegantly phrased, the judge got it right. His quote captures the essence of the State's duty—as complex and frustrating as it may be—in our modern society in which everyone, big or small, is governed by the same Constitution and the rule of law.

## III. CONCLUSION

{99} We reverse the Court of Appeals and remand to the district court for further proceedings consistent with this opinion.

{100} **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice,**
**Retired, Sitting by Designation**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**