The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: May 18, 2026

**NO. S-1-SC-40535**

**STATE OF NEW MEXICO,**

Plaintiff-Respondent,

v.

**BRANDON VILLALOBOS,**

Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James L. Sanchez, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Raúl Torrez, Attorney General
Santa Fe, NM
Serena R. Wheaton, Assistant Solicitor General
Albuquerque, NM

for Respondent

**OPINION**

**VIGIL, Justice.**

{1}     First and foremost, this appeal presents the question of whether a defendant's constitutional right to a speedy trial is violated in circumstances where, as here, the defendant is incarcerated and awaiting trial for a period just short of six years, and a sizable portion of the delay is attributable to the neglect of assigned defense counsel in timely scheduling and properly arranging the defendant's competency evaluation. Under the disturbing facts of this case, we hold that Defendant Brandon Villalobos—who has an intellectual disability and was fifteen years of age at the time of the underlying incident, his arrest, and the start of his extended pretrial incarceration—was deprived of his speedy trial rights. *See generally State v. Ochoa*, 2017-NMSC-031, ¶¶ 5, 13, 406 P.3d 505 (characterizing a defendant's speedy trial right as one adjudged "on a case-by-case basis"). We take this opportunity to clarify the application of our speedy trial caselaw in instances where defense counsel is negligent and the defendant has an intellectual disability impacting their ability to guide the litigation and assert their right to a speedy trial. As explained herein, we reverse the contrary holdings reached by the district court and the Court of Appeals. *State v. Villalobos*, A-1-CA-39820, mem. op. ¶¶ 4-32 (N.M. Ct. App. July 24, 2024) (nonprecedential).

{2} Before considering the facts and circumstances of this case, we pause briefly to address the precedential impact on the matter at hand of this Court's split opinion in *State v. Gurule*—our most recent foray into the constitutional speedy trial realm. 2025-NMSC-010, 563 P.3d 775 (filed Dec. 7, 2023). In *Gurule*, this Court grappled with a broader question than that framed here: how best to evaluate trial delays caused by the pendency of a criminal defendant's competency proceedings. *Id.* ¶¶ 24-30. A narrow majority of the *Gurule* Court concluded, as a general proposition, "that delays due to competency evaluations are chargeable to the defendant," expressly rejecting the notion that individual "periods of procedural delay should be parsed from within [a] larger category of delay for competency determinations." 2025-NMSC-010, ¶¶ 27-28. This approach stemmed from the Court's stated rationale that "the process of adjudicating competence is [itself undertaken] 'for the benefit of the defendant.'" *Id.* ¶ 28 (quoting *State v. Mendoza*, 1989-NMSC-032, ¶ 9, 108 N.M. 446, 774 P.2d 440).

{3} Significantly for our purposes, the defendant in *Gurule* did not have an intellectual disability that positioned him similarly to the defendant in this case. *See id.* ¶¶ 6-7. Further, the *Gurule* majority took pains to contrast and distinguish the very situation presented in the appeal at hand—in which our speedy trial analysis turns on competency-related delays that are attributable largely to neglect on the part

of defense counsel. *Id.* ¶¶ 29-30. In the process, the *Gurule* majority recognized, at least implicitly, the continued viability of two case precedents that took a decidedly different approach to that adopted in *Gurule* in resolving a similar but distinct speedy trial question, one arising in the context of a defense attorney's neglect. We refer to *State v. Serros*, 2016-NMSC-008, 366 P.3d 1121, and *State v. Stock*, 2006-NMCA-140, 140 N.M. 676, 147 P.3d 885, each deservedly viewed as "an important, well-reasoned part of our speedy trial jurisprudence in cases when [as here] the delay is extraordinary and the defendant is held in custody." *Serros*, 2016-NMSC-008, ¶ 43. As a preliminary matter, we emphasize that, by necessity, our ensuing speedy trial analysis here is influenced more by the teachings of *Serros* and *Stock* than those of *Gurule*. To be sure, *Gurule* remains good law but law whose reach does not extend to the facts of this case. That being so, we have no occasion to address Defendant's concern that the speedy trial analysis laid out in *Gurule* is "unworkable."

## I.    BACKGROUND

{4}    On February 18, 2014, the then fifteen-year-old Defendant—who has an intellectual disability with an IQ of sixty-four—was arrested and then charged with first-degree murder and tampering with evidence in connection with the alleged killing of twelve-year-old A.M., while the two were playing together near

Defendant's home. Defendant is indigent and was at all times represented by appointed counsel.

{5} Defendant's arraignment on March 21, 2014, was notable in two respects. First, the arraignment court imposed a $500,000 cash-only bond. The inability of Defendant's family to post the bond began what would become a nearly six-year period of pre-conviction incarceration for Defendant. And second, Defendant's arraignment counsel raised the issue of Defendant's competency to stand trial, advising the arraignment court, "I do not believe that he understands his rights nor the charges against him."

{6} Following Defendant's arraignment, there ensued a long series of competency-related status conferences, during which the competency issue remained unresolved for three years and three months, until June 30, 2017, when the district court determined after a hearing that Defendant was competent to stand trial. In assigning fault for the extended duration of the competency determination process, the district court pointed to Defendant's then-replaced trial counsel in delaying the scheduling and holding of the defense-generated competency evaluation. As we will see, it is this aspect of the extraordinary delay in bringing this prosecution to trial that served to unreasonably extend the timeline of this case.

{7}     At the State's request, a status conference was held on October 8, 2014. At the status conference, Defense counsel said he had contacted a psychiatrist and needed sixty days to have a competency evaluation completed. A status conference was held, once again, on the State's request, on March 27, 2015. Defense counsel reported that no evaluation had been done. From March 27, 2015, to November 20, 2015, the State did nothing to move the case forward. The district court sua sponte held status conferences in May 2015, July 2015, and November 2015. Each time, defense counsel stated he had failed to initiate Defendant's competency evaluation. At the November status conference, defense counsel stated the psychologist "indicated to me she was having some difficulty with the Public Defender's Office . . . . I have not been able to contact her since." The parties and the district court collectively agreed upon another psychologist, Dr. Barry Fields, to complete Defendant's competency evaluation.

{8}     At the next status conference on May 6, 2016, defense counsel told the district court that he did not know what happened with Dr. Fields's evaluation even though the court had ordered the evaluation occur within thirty days. The court asked defense counsel if he could get the evaluation by July 25, 2015, and defense counsel stated, "I don't know." The court then issued an order on May 10, 2016, that the competency evaluation be completed within thirty days of May 6, 2016, and "if an

evaluation is not provided to the Parties within that time, that the [c]ourt will set a hearing to show cause as to why the evaluation was not completed, and all Parties, including Dr. Barry Fields who has been hired to conduct the evaluation, will be required to appear before the [c]ourt."

{9} On June 16, 2016, the State requested a status conference. The status conference was held on June 27, 2016. Defense counsel admitted to the court that he misplaced necessary discovery for Defendant's evaluation, and this was the reason the previous psychologist was unable to perform the evaluation. Defense counsel admitted, "my office misplaced that discovery" and "the evaluation not getting it done with the psychologist is my fault."

{10} Thus, from November 20, 2015, through June 27, 2016, defense counsel was directly at fault for delaying Defendant's competency evaluation. On October 5, 2016, the district court ordered Dr. Fields to provide his notes to the State's psychologist for an independent competency evaluation. Then, at a competency hearing on December 2, 2016, the district court found Defendant incompetent to stand trial and ordered Defendant be committed to the New Mexico Behavioral Health Institute (NMBHI) in Las Vegas, New Mexico, for treatment to attain competency to stand trial. Defendant received treatment at NMBHI from January

18, 2017, to around March 7, 2017. From March to June 2017, Defendant was awaiting a new competency hearing, and the case sat for another three months.

{11} On March 31, 2017, new defense counsel entered his appearance for Defendant and a June 6, 2017, date was initially set for the competency hearing. The competency hearing was held on June 30, 2017, where the court determined that Defendant was competent to stand trial. At a subsequent hearing, the district court found, "Ninety-nine percent of th[e] delay [in obtaining the competency evaluation] was caused by prior defense counsel."

{12} Defendant's first trial began December 16, 2019, and resulted in a mistrial. Following Defendant's second trial, February 4, 5, 6, 7, and 10, 2020, a jury acquitted Defendant of first-degree murder but convicted him of second-degree murder and tampering with evidence. Following an amenability hearing, September 9, 10, and 23, 2020, where Defendant was found "not amenable to treatment and rehabilitation," then twenty-two-year-old Defendant was sentenced as an adult to an aggregate prison term of eighteen years, with presentence confinement credit of nearly seven-and-a-half years.

## II. DISCUSSION

### A. Speedy Trial Analysis and the Governing Standard of Review

{13} In determining whether a defendant has been deprived of their constitutional right to a speedy trial, we invoke the quartet of factors set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), "balancing the length of delay, the reason for delay, the defendant's assertion of the right to a speedy trial, and the prejudice to the defendant." *Ochoa*, 2017-NMSC-031, ¶ 4. In weighing these factors, we consider "the unique circumstances of each case in light of 'the [s]tate and the defendant's conduct and the harm to the defendant from the delay.'" *Serros*, 2016-NMSC-008, ¶ 5 (quoting *State v. Garza*, 2009-NMSC-038, ¶ 13, 146 N.M. 499, 212 P.3d 387). No single speedy trial factor is necessary or dispositive or is imbued with "any 'talismanic quality,' and each can be assigned different significance or different weight in the 'difficult and sensitive balancing process' that must take place." *Work v. State*, 1990-NMSC-085, ¶ 11, 111 N.M. 145, 803 P.2d 234 (quoting *Barker*, 407 U.S. at 533). We defer to the district court's factual findings in evaluating a speedy trial claim, while weighing each factor de novo. *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272. To properly assess the speedy trial claim advanced by Defendant in this case, we consider each of the *Barker* factors in turn.

**B.** **A Proper Application of the *Barker* Factors Demonstrates That Defendant's Right to a Speedy Trial Was Violated**

**1.** **Length of delay**

{14} The initial *Barker* factor, the length of delay, serves "a dual function: it acts as a triggering mechanism for considering the four *Barker* factors if the delay crosses the threshold of being 'presumptively prejudicial,' and it is an independent factor to consider in evaluating whether a speedy trial violation has occurred." *Serros*, 2016-NMSC-008, ¶ 22 (quoting *Garza*, 2009-NMSC-038, ¶¶ 21, 23). This Court has "established benchmarks for presumptively prejudicial delay according to the complexity of a case: one year for a simple case, [fifteen] months for a case of intermediate complexity, and [eighteen] months for a complex case." *Id.* The district court found that Defendant's case is complex, a determination unchallenged on appeal.

{15} Both sides agree, as they must, that the nearly six-year delay between (then teenage) Defendant's arrest and the commencement of (now adult) Defendant's second trial had "become presumptively prejudicial irrespective of the case's complexity." *Id.* ¶ 23; *id.* ¶¶ 24, 26 ("[A]n extraordinary delay, like the [four-year-three-month] delay in [*Serros*], weighs heavily in favor of a defendant's speedy trial claim, bearing in mind that no single factor is dispositive of whether a violation has occurred."); *State v. Maddox*, 2008-NMSC-062, ¶¶ 12, 37, 145 N.M. 242, 195 P.3d

1254 (treating a twenty-eight-month delay as "extraordinary" and evaluating all four *Barker* factors in detail to determine whether the unique facts significantly tempered the prejudice to the defendant), *abrogated on other grounds by Garza*, 2009-NMSC-038, ¶¶ 47-48. *But see Ochoa*, 2017-NMSC-031, ¶¶ 15, 17 (determining that a two-year delay in a complex case, "while sufficient to trigger the speedy trial analysis, . . . was not extraordinary" and thus weighed only slightly against the state). In view of the foregoing, and considering the State's candid concession that the *length of delay* factor weighs strongly in Defendant's favor, "'the burden of persuasion shifts to the State to show that, considering the four factors as a whole, the defendant's constitutional rights have not been violated.'" *Maddox*, 2008-NMSC-062, ¶ 12 (quoting *State v. Urban*, 2004-NMSC-007, ¶ 11, 135 N.M. 279, 87 P.3d 1061).

**2.     Reasons for the delay**

{16}     Two distinct time periods account for roughly three-quarters of the lengthy (nearly six-year) pre-trial delay[1] in this case: (1) the three-year-three-month delay between Defendant's arraignment on March 21, 2014, and his competency hearing on June 30, 2017, during which the issue of Defendant's competency remained

---

[1]There is no dispute that the aggregate speedy trial delay period here is properly measured from the date of Defendant's arrest (February 18, 2014) to the commencement of Defendant's second trial (February 4, 2020).

unresolved and (2) the fourteen-month pendency period—from May 16, 2018, to July 23, 2019—of the State's unsuccessful interlocutory appeal from the district court's partial grant of Defendant's motion to suppress evidence. We focus our attention on these two time periods, which we examine in reverse order.

### a. The State's interlocutory appeal

{17} A delay attributable to a party's unsuccessful pursuit of an interlocutory appeal is generally chargeable to the appealing party for speedy trial purposes only in circumstances where the appeal bears on a "'clearly tangential or frivolous'" issue or where "'the charged offense [is not] sufficiently serious to justify restraints that may be imposed on the defendant pending the outcome of the appeal.'" *State v. Flores*, 2015-NMCA-081, ¶ 28, 355 P.3d 81 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315-16 (1986)). Neither of these criteria is met in this case, in which the severity of the child-on-child homicide prosecuted here is all too clear on its face. And the fact that a justice of this Court dissented on the merits of the State's earlier interlocutory appeal, *State v. Villalobos*, S-1-SC-37103, dispositional order (N.M. June 24, 2019) (nonprecedential) (Nakamura, C.J., dissenting), speaks volumes against a determination that the prior appeal was in any way tangential or frivolous. *See generally Montes v. Nat'l Buick GMC Inc.*, 2023 UT App 47, ¶ 26, 530 P.3d 544 ("Given that . . . our own esteemed colleague disagrees with [and dissents from] our

resolution, this case clearly does not involve a frivolous appeal."), *rev'd on other grounds*, 2024 UT 42, 562 P.3d 688.

{18} Nor do we accept Defendant's invitation to "give less deference to the [s]tate's interlocutory appeal in a *juvenile* case . . . where the clock is ticking on a child's amenability to treatment" than is typically accorded the state in a criminal appeal involving an adult defendant. (Emphasis added.) Granted, this Court has long recognized "the conundrum" created by the so-called aging-out of a juvenile defendant and this state's need for "a legislative solution to the sentencing gaps created by the Delinquency Act[, NMSA 1978, §§ 32A-2-1 to -33 (1999, as amended through 2025),] and the criminal justice system." *State v. Jones*, 2010-NMSC-012, ¶¶ 55, 57, 148 N.M. 1, 229 P.3d 474. But the appropriate remedy for addressing these concerns does not lie in ignoring the vital "assurance that motions to suppress evidence . . . are correctly decided through orderly appellate review[, a process that] safeguards both the rights of defendants and the rights of public justice." *Flores*, 2015-NMCA-081, ¶ 28 (internal quotation marks and citation omitted). We choose not to mitigate one problem while creating another.

{19} In all, we weigh neutrally the fourteen-month delay resulting from the State's interlocutory appeal. *Id.* ¶ 29 (weighing a sixteen-month delay caused by the state's interlocutory appeal neutrally in the absence of a defense showing that "the appeal

was brought in 'bad faith' or for a 'dilatory purpose'") (quoting *Loud Hawk*, 474 U.S. at 316).

**b.      The delayed competency proceedings**

{20}     Defendant stands on firmer footing when it comes to the second of his two major speedy trial claims that involves the even more protracted three-year-three-month time period during which the issue of Defendant's competency remained open. As will be shown below, the combined force of *Stock* and *Serros* necessarily makes this so.

{21}     Before exploring these two well-reasoned cases, we discuss the proper start date of the competency-resolution time period. Both the district court and the Court of Appeals measured the commencement of this time period from the date of Defendant's arraignment, March 21, 2014. This is because, as the Court of Appeals explained, it was then and there that Defendant's arraignment counsel signaled her belief that Defendant's intellectual disability would prevent him from understanding "his rights or the charges against him." *Villalobos*, A-1-CA-39820, mem. op. ¶ 7. The State now makes clear its preference—albeit without couching that preference in terms of a cognizable legal argument—that the competency inquiry be viewed as starting not at the time the issue was "arguably raised" at Defendant's arraignment but rather some six-and-a-half months later, at a status conference held on October

8, 2014—the date on which, in the State's unexplained and unsupported view, the defense "formally raised" the competency issue.

{22} From a procedural perspective, we see no reason to entertain the State's undeveloped suggestion and be sent down a proverbial rabbit hole. *See Lee v. Lee* (*In re Adoption of Doe*), 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (cautioning that "to present an issue on appeal for review, [a party] must submit *argument and authority* as required by rule" (first emphasis added)); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (text only)[2] (citation omitted)). But even were we to consider the merits of the State's vaguely stated concerns, it still would not be clear that adherence to the later October 8, 2014, start date now suggested by the State was warranted, much less required. *See State v. Garcia*, 2000-NMCA-014, ¶¶ 4-5, 128 N.M. 721, 998 P.2d 186 (indicating that while a defendant may be considered "competent for purposes of arraignment" even where defense counsel expresses doubt at arraignment as to the defendant's competency, defense counsel's input on the issue nonetheless serves to

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks— including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

inform the court "that the issue was likely to recur throughout the pretrial proceedings").

{23} Having established the start date of March 21, 2014, for this critical, competency-related portion of the speedy trial clock, we turn to the twin cases of *Serros* and *Stock* the wisdom of which informs much of our analysis here. This Court's opinion in *Serros* described at length how the unanimous Court of Appeals opinion authored by Judge Pickard in *Stock* had successfully forged a new and "compelling" approach to analyzing the reasons-for-the-delay factor in criminal prosecutions that are burdened by extraordinary delays occasioned by defense counsel's neglect. 2016-NMSC-008, ¶¶ 36, 38.[3] The *Serros* Court noted and praised *Stock*'s attributes, highlighting two in particular:

> First, the Court acknowledged "the general rule that a defendant must be held accountable for the actions of his or her attorneys," but it reasoned that the delays in the defendant's case, which had not been requested or consented to by the defendant, amounted to "neglect" by his attorneys. As such, the delays could not be held against the defendant for speedy trial purposes because they were "unreasonable and unnecessary" and "solely attributable to defense counsel."
>
> Second, *Stock* concluded that the "extraordinary delay was partially attributable to the State" because the State had done "little or

---

[3]The unanimous *Serros* opinion signals that the rule announced therein may be applicable to *any* defense-counsel-caused delay that is "extraordinary" and involves a defendant who "is detained while awaiting trial," and this irrespective of whether the delay concerns a competency evaluation. 2016-NMSC-008, ¶ 38.

nothing to ascertain what was happening in the case or to move the case forward." The Court observed, "It is ultimately the state's duty to make sure that defendants are brought to trial in a timely manner." The Court therefore concluded that while the delay was "technically attributable to the defendant, because it was occasioned by his counsel pursuing or, more accurately, failing to pursue, the issue of his competency," the reasons for the delay weighed against the State because of its "failure to monitor the case and ensure that steps were being taken to bring the defendant to trial in a timely manner." Thus the Court held on the one hand that the delays occasioned by defense counsel did not weigh against the defendant, and it held on the other hand that the particularly egregious delay weighed against the State because of its failure to push the case to trial.

*Serros*, 2016-NMSC-008, ¶¶ 36-37 (brackets and citations omitted). In circumstances where both of the above-quoted criteria are present—that is, delay-causing neglect on the part of defense counsel *and* a contributory failure on the part of the prosecution to diligently monitor the progress of its case—the *Serros* Court "agree[d] that it may be appropriate to shift the [speedy trial] focus to the [s]tate's efforts to bring the case to trial, at least when the record demonstrates that the defendant did not affirmatively cause or consent to the delay." *Id.* ¶ 38.

{24}     Distilling *Stock* to its essence, this Court's opinion in *Serros* "adopt[ed] and extend[ed] *Stock*'s two-part approach for determining whether the reasons for the delay in such a case should weigh against a defendant or the [s]tate" in the following manner: "We first consider whether [the d]efendant is to blame for the delays in [a particular] case because [they have] *personally* caused or acquiesced to the delay in

[the] case. If not, then we consider whether the [s]tate has met its obligation to bring [the d]efendant's case to trial." *Serros*, 2016-NMSC-008, ¶ 43 (emphasis added).

{25} A proper application of this two-prong *Serros/Stock* approach to the facts of this case unquestionably weighs in favor of Defendant. As to the first requirement, there is little room for debate that prolonged neglect on the part of defense counsel was the primary source of the extraordinary delays stemming from Defendant's competency proceedings; indeed, the district court expressly found this to be the case, acknowledging "the defense attorney's failure to push the competency evaluation expeditiously" and defense counsel having single-handedly caused almost all of the competency-related delays. Nor is there any indication or contention that then-teenage Defendant who has an intellectual disability was capable of providing meaningful input regarding the planning or scheduling of his own competency evaluation or, by extension, that Defendant had the ability to have "personally caused or acquiesced to the delay in his case." *Serros*, 2016-NMSC-008, ¶ 43.

{26} Moreover, looking at the reasons for the delay as a whole under the two-step approach we adopted in *Serros*, it is reasonable to conclude that the State "shares blame for the extraordinary delay in this case" based on its demonstrated "failure to push the case to trial." *See id.* ¶¶ 37, 73. Notable for its absence is any assertion in

the State's briefing herein that it took reasonable steps to meet its "obligation to monitor and move the case forward." *Id.* ¶ 41. By way of example, one way for the State to have moved the case forward would have been to express appropriate concerns over the repeated delay in the progress of the case during any of the long series of status conferences held on the competency issue. As this Court made clear in *Serros*, "[W]e do not deem it unfair to impose upon the prosecution the burden of monitoring the progress of [a criminal] case and, at some point, alerting the trial court of potential speedy trial consequences." *Id.* ¶ 96.

{27}   Perhaps best illustrative of the State's failures in this regard was the lead prosecutor's silence in response to defense counsel's belated revelation during the status conference of June 27, 2016—more than two years into the competency evaluation process—that the then long-overdue status of Defendant's competency evaluation was counsel's own doing, the result of his law "office [having] misplaced" some of the discovery materials provided by the State. And all this was despite counsel's insistence during the preceding status conference held on May 6, 2016, that he did not know and could not explain "what's happened" with his retained psychologist that would have prevented the psychologist from evaluating Defendant.

{28} It is well to emphasize, as *Serros* teaches, that "at some point [speedy trial] delay simply becomes intolerable" and that, in result, the prosecution is "uniquely" cloaked with the duty—"as the [s]tate's representative—to ensure that the accused is prosecuted in a manner consistent with the Constitution." 2016-NMSC-008, ¶¶ 97-98. As *Serros* goes on to explain:

> This is no less true for the right to a "speedy and public trial" under the Sixth Amendment [of the United States Constitution] than it is for the right to counsel and confrontation under that same amendment, and the rights against self-incrimination under the Fifth Amendment and against unreasonable searches and seizures under the Fourth Amendment. The [s]tate must ensure that justice is done.

*Id.* ¶ 97.

{29} It is fair to say that the State failed to meet that responsibility here and, in doing so, allowed a teenage defendant with an intellectual disability to languish in jail for some three years and three months while his competency proceedings inched along at a glacial pace. This does not mean that the entire thirty-nine-month competency-delay period is properly chargeable to the State. As Defendant candidly and appropriately concedes on appeal, roughly eight-and-a-half months of the competency-related delay is properly weighed neutrally or against Defendant. Subtracting these months results in a significant, unreasonable, State-caused,

competency-related delay of over two-and-a-half years.[4] *See Serros*, 2016-NMSC-008, ¶ 29 ("As the length of delay increases, negligent or administrative delay weighs more heavily against the [s]tate."); *Garza*, 2009-NMSC-038, ¶ 26 ("The degree of weight we assign against the [s]tate for negligent delay is closely related to the length of delay: [O]ur toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial." (second alteration in original) (internal quotation marks and citation omitted)).

{30}     Regrettably, the unfair impact of the delay is heightened in the unfortunate circumstances of this case and considering that Defendant, a teenager with an intellectual disability who, as indicated above, has now aged out of the juvenile system and has been held in custody throughout the entirety of the extended proceedings. *See* § 32A-2-20(F) (providing that an individual charged as a youthful offender who receives a juvenile sentence may be committed to the care of the Children, Youth and Families Department until the age of twenty-one); *see also, e.g., United States v. Roberts*, 515 F.2d 642, 646 (2d Cir. 1975) (recognizing that a

---

[4]It also appears that an additional period of delay can safely be chargeable to the State: the roughly six-week period between the December 17, 2019, declaration of a mistrial in Defendant's first trial based on a statement made by a State's witness and the February 4, 2020, start date of Defendant's second trial. *See Villalobos*, A-1-CA-39820, mem. op. ¶ 21.

speedy trial "delay not patently unreasonable in length may nonetheless be intolerably long" in circumstances where the defendant loses "the right to be considered for youthful offender treatment" and the "notable advantages" such treatment provides); *Interest of A.M.*, 2025 PA Super 171, 23, 343 A.3d 341 ("conclud[ing] that the loss of rehabilitative benefits constitutes a colorable basis of concern that a [j]uvenile [c]ourt must weigh in analyzing . . . *Barker*'s balancing test in the context of a delinquency proceeding"); *see generally* Rebecca Rosefelt, Note, *Children in Limbo: The Need for Maximum Limits for Juvenile Pretrial Detention*, 28 Minn. J. Int'l L. 239, 244 (2019) (observing that "[t]he lack of emotional support paired with the stress of detention has irreversible effects on the psychological development of children").

{31}     In the end, the reasons-for-the-delay factor weighs heavily against the State in this matter, as it did in *Serros*. *See Serros*, 2016-NMSC-008, ¶¶ 74-75 (emphasizing that its holding was "based on the [s]tate's conduct, . . . which we h[e]ld contributed to the extraordinary delay in th[at] case" and indicating that the defendant therein "did not affirmatively cause or acquiesce in [any of] the delays"); *see generally Flores*, 2015-NMCA-081, ¶¶ 10, 37 ("dividing the nearly sixty-two month delay in [that complex] case into digestible portions" and concluding that the reasons-for-the-delay factor weighed heavily in the defendant's favor in circumstances where

"at least thirty-six months of it was attributable to the [s]tate's negligence and administrative burdens"). To rule otherwise under the circumstances of this case would further the unfortunate reality that, "[a]s a group, criminal defendants with serious mental disabilities spend longer periods of time in jail awaiting a disposition of their charges . . . as compared to others charged with comparable offenses." Henry Dulgacz, *Jail and Prison Conditions*, *in Representing People with Mental Disabilities: A Criminal Defense Lawyer's Best Practices Manual* 225, 228 (Elizabeth Kelley ed., 2018). There is no place in our jurisprudence for such a callous and counterintuitive outcome.

**3.      Assertion of the right**

{32}      Borrowing a page from *Barker*, this Court in *Work* made clear some thirty-five years ago that no single *Barker* factor "is either a necessary or a sufficient condition to a finding that there has been a deprivation of the right to a speedy trial" and that each factor "can be assigned different significance . . . [and] must be evaluated on a spectrum of significance" in the "'difficult and sensitive balancing process'" entailed in a speedy trial analysis. *Work*, 1990-NMSC-085, ¶ 11 (quoting *Barker*, 407 U.S. at 533). The efficacy of the assertion-of-the-right factor hinges in particular on the commonsense premise that "[t]he more serious the [speedy trial] deprivation, the more likely a defendant is to complain" about it and, thus, that a

defendant's assertion of the right is generally "entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. But that premise loses viability in circumstances where, as here, a defendant's intellectual disability affects their ability to make decisions bearing on when and how to assert their right to a speedy trial.

{33}    Our Court of Appeals recognized this reality in *Stock*, concluding that the assertion-of-the-right factor plays a far less significant role in a court's speedy trial calculus in cases involving a defendant with an intellectual disability. 2006-NMCA-140, ¶¶ 30-33. This is reflected in several passages of the *Stock* opinion, including language expressing the Court's "unwilling[ness] to put a great deal of weight on [a d]efendant's failure to assert his [speedy trial] right under the circumstances" where the defendant has an intellectual disability and its recognition of the inherent unfairness of "put[ting] great emphasis" on the assertion-of-the-right factor in view of a defendant's cognitive disability. *Id.* ¶¶ 30, 33 (observing that "the district court credited an expert report that stated that [the d]efendant has the intellectual capacity of a twelve-year-old" and questioning, as did the district court, "whether a twelve-year-old could even understand the concept of a speedy trial or of continuances").

{34}    In a similar vein, this Court in *Serros* also weighed in on the assertion-of-the right factor, drawing a critical distinction "between [the *d*]*efendant* agreeing to the

[s]tate's requests to extend the time for commencing his trial and [the *d*]*efendant's attorneys* agreeing to such requests." 2016-NMSC-008, ¶ 79. Ultimately concluding that the defendant therein "asserted his right to a speedy trial throughout the proceedings in the best way he knew," the *Serros* Court upheld the district court's determination that the defendant "did not agree to the requests [made by his successive attorneys] to extend the time for commencing his trial" and ultimately weighed the assertion-of-the-right factor in the defendant's favor, even though his trial attorneys "did not further [the d]efendant's efforts." *Id.* ¶¶ 79, 83.

{35}     The respective situations presented in *Stock* and *Serros* were well summed up by this Court in *State v. Castro*: "The *Stock* defendant's mental capacity affected his ability to assert his right to a speedy trial, and the *Serros* defendant adamantly and continuously asserted his right; therefore, both were blameless, and it would be unfair to hold them accountable for the delays caused by their attorneys." 2017-NMSC-027, ¶ 13, 402 P.3d 688. Under this synopsis of the law, Defendant's intellectual disability herein prevented him from asserting his right to a speedy trial, as was the case in *Stock*, 2006-NMCA-140, ¶ 11, and as in *Serros*, there was no evidence in the case at hand that Defendant "acquiesce[d] in the delays," 2016-NMSC-008, ¶ 74.

{36} Putting aside the distinctions in approach between *Serros* and *Stock* and more conventional speedy trial cases, the basic methodology used in evaluating the assertion-of-the-right factor remains largely unchanged under the cited cases' analyses. Under the tenets of both cases, we still "accord weight to the frequency and force of the defendant's [or their attorney's] objections to the delay[, and we] also analyze the defendant's [or their attorney's] actions with regard to the delay." *Serros*, 2016-NMSC-008, ¶ 76 (second alteration in original) (internal quotation marks and citation omitted) ("The timeliness and vigor with which the right is asserted may be considered as an indication of whether a defendant was denied needed access to a speedy trial over his objection or whether the issue was raised on appeal as an afterthought." (text only) (citation omitted)).

{37} Yet, we must also bear in mind the flexible nature of the assertion-of-the-right factor, one that may be satisfied by "a single [defense] demand for a speedy trial." *Ochoa*, 2017-NMSC-031, ¶ 42. As our colleagues on the Utah Supreme Court recently recognized, for the assertion-of-the-right "factor to weigh in a defendant's favor, a defendant should, at the very least, manifest his desire to be tried promptly," *State v. Hintze*, 2025 UT 3, ¶ 62, 567 P.3d 506 (text only) (citation omitted), a standard that "does not require that a defendant use specific words or manifest that

desire in one particular way, so long as the defendant demonstrates a desire for a speedy trial." *Id.*

{38} Here, Defendant filed a demand for a speedy trial when his counsel entered his initial appearance in April 2014; reasserted that demand upon the State's unsuccessful interlocutory appeal of the suppression issue; and twice moved for dismissal on speedy trial grounds, once before the start of Defendant's first trial and again after a mistrial was declared. These defense efforts, all told, were sufficient for us to weigh this factor in Defendant's favor.

**4.       Prejudice and balancing the *Barker* factors**

{39} As for the fourth and final factor, this Court recognized in *Serros* that, "[o]rdinarily, a defendant bears the burden of proof on this factor by showing 'particularized prejudice' when claiming a speedy trial violation." 2016-NMSC-008, ¶ 86 (citation omitted). However, *Serros* also quoted the following passage from *Garza*: "[I]f the length of delay and the reasons for delay weigh heavily in [the] defendant's favor and [the] defendant has asserted his right and not acquiesced to the delay, then the defendant need not show prejudice for a court to conclude that the defendant's right has been violated." 2016-NMSC-008, ¶ 86 (quoting *Garza*, 2009-NMSC-038, ¶ 39).

{40} Despite the textual reality that the passage quoted above identifies only the first *two* of the *Barker*/*Garza* factors—the length and reasons for the delay—as needing to weigh heavily in a defendant's favor in order to dispense with proof by the defendant of particularized prejudice, *Garza* is generally read to require the defense to make a strong evidentiary showing on all of the first *three* factors— including the assertion-of-the-right factor—in order to avoid the need to present affirmative evidence of prejudice to the defendant. *See, e.g.*, *State v. Samora*, 2016-NMSC-031, ¶ 23, 387 P.3d 230 ("To find a speedy trial violation without a showing of actual prejudice, the Court must find that the three other *Barker* factors weigh heavily against the [s]tate." (citing *Garza*, 2009-NMSC-038, ¶ 39)).

{41} Judicial insistence on the use of this all-or-nothing, three-factor approach, assuming it to be sound when applied to a typical speedy trial scenario,[5] is unreasonable in the limited circumstances presented here as well as those presented in *Stock*, where fairness dictates us to be "unwilling to put a great deal of weight on [a d]efendant's failure to assert his right" in view of the defendant's intellectual

---

[5]Without weighing in on the merits of the issue, we note the thoughtful dissent written by Judge Jane B. Yohalem of the Court of Appeals calling into question the validity of this widely-used, three-factor approach in an ordinary case. *See State v. Barker*, A-1-CA-40495, mem. op. ¶¶ 46-49 (N.M. Ct. App. Nov. 21, 2023) (nonprecedential) (Yohalem, J., dissenting). Any critique of that approach is best left for another case and the benefit of full briefing by the parties.

disability. 2006-NMCA-140, ¶ 30. Adhering to *Stock*'s teachings that "it would not be fair [for courts] to put great emphasis" on the assertion-of-the-right factor in prosecutions brought against defendants with intellectual disabilities, *id.* ¶ 33, we conclude that prejudice resulting from a speedy trial violation is properly presumed in such cases where the first two *Barker* factors weigh heavily in favor of the defendant and, in addition, the third, assertion-of-the-right, factor weighs in the defendant's favor, no matter to what extent.[6]

{42}    Because, as previously shown, this standard was met here, we presume undue prejudice even without a showing of actual prejudice. *See Garza*, 2009-NMSC-038, ¶ 13 ("This analysis specifically rejects inflexible, bright-line approaches to analyzing a speedy trial claim."); *see also Doggett v. United States*, 505 U.S. 647, 655 (1992) (recognizing that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," and acknowledging that "affirmative proof of particularized prejudice is not essential to every speedy trial claim").

---

[6]The Court of Appeals in *Stock* made no mention of the presumed prejudice standard, apparently as a result of the Court's adverse holding that the "[d]efendant's failure to timely assert his rights weigh[ed] slightly against him." 2006-NMCA-140, ¶ 45.

{43}     Although our speedy trial analysis could end here, we address an aspect of the Court of Appeals' opinion below that gives us pause: the Court's refusal to consider Defendant's "characteristics"—his "youth and [intellectual] disability" to be precise—"in assessing whether pretrial incarceration [was] particularly prejudicial" to Defendant in this case. *Villalobos*, A-1-CA-39820, mem. op. ¶ 30.

{44}     This self-limiting, hands-off approach taken by the Court of Appeals runs counter to the well-established practice of New Mexico appellate courts to consider the *Barker* factors on an ad hoc, case-by-case basis and to examine "the interests of defendants which the speedy trial right was designed to protect . . . *in light of the specific facts and circumstances of each case.*" *Ochoa*, 2017-NMSC-031, ¶¶ 5, 48 (emphasis added) (internal quotation marks and citation omitted); *see Stock*, 2006-NMCA-140, ¶ 45 (recognizing that a "speedy trial analysis is not 'mechanical' and must take into account *all the relevant circumstances*" (emphasis added) (citation omitted)).

{45}     Surely one might expect a criminal defendant's young age and intellectual disability to constitute relevant considerations in evaluating the fairness and efficacy of a prolonged and potentially oppressive pretrial incarceration. *See Garza*, 2009-NMSC-038, ¶ 35 (identifying the three potential sources of prejudice caused by delay as (1) "oppressive pretrial incarceration," (2) "anxiety and concern of the

accused," and (3) impairment of the defense (internal quotation marks and citation omitted)). And there is sufficient authority nationwide to justify such an expectation. *See, e.g.*, *Khalifa v. Cash*, 594 F. App'x. 339, 342-43 (9th Cir. 2014) (Pregerson, J., dissenting) (quoting *Barker*, 407 U.S. at 532, that "'time spent in jail awaiting trial has a detrimental impact on the individual,'" in concluding that the habeas petitioner's "three-and-a-half year pretrial incarceration and the anxiety it caused him—a teenager awaiting trial for felony murder—weigh in favor of finding that [the petitioner] was prejudiced by the delay"); *United States v. Rogers*, 781 F. Supp. 1181, 1189-90 (S.D. Miss. 1991) (recognizing that prejudice may arise from a defendant's advancing age and cognitive decline following an indictment, where the "defendant's impaired cognitive functions" prevented him from "meaningfully assist[ing] in his defense"); *State ex rel. Miller v. Craft*, 337 So. 2d 1191, 1194-95 (La. 1976) (acknowledging that the court was left to "speculate on the degree of anxiety engendered in an accused" with an apparent intellectual disability who, among other things, was "incarcerated for almost two years" and concluding "that the interests sought to be protected by the right to a speedy trial have been violated"). Just as a defendant's young age and intellectual disability can have a substantial impact on their ability to assert their speedy trial rights, so too should those same traits play a substantial role in determining whether a given defendant has suffered

undue prejudice in a particular case. To the extent the Court of Appeals' opinion below, *Villalobos*, A-1-CA-39820, mem. op. ¶ 30, may support a contrary conclusion, it should not be followed.

## III. CONCLUSION

{46} For the foregoing reasons, we reverse the Court of Appeals and the district court and remand the matter to the district court with instructions to vacate Defendant's convictions and dismiss the indictment. In light of this disposition, we have no occasion to reach the other issues raised by Defendant.

{47} **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**JULIE J. VARGAS, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**DAVID K. THOMSON, Justice**

_____

**BRYAN BIEDSCHEID, Judge**
**Sitting by designation**